[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 483 
On appeal from a decree of the former Court of Chancery advised by Vice Chancellor Fielder who filed the following opinion:
"David Vollinger died January 9, 1948. This is a suit brought by the executor of his will and codicil and by one who is a legatee and devisee thereunder, to set aside conveyance made by decedent to his wife, the defendant Agnes Vollinger, dated January 3, 1948, of the two parcels of real property he owned and also to set aside the gift to his wife and his stepdaughter, the defendant Bertha H. Sharvat, on various dates between January 5 and 8, 1948, of all money in his two bank accounts.
"Vollinger was a retired business man eighty-one years of age who had married the defendant, his second wife, in 1936, and was living with her up to the time of his death. His stepdaughter came to live with him in August, 1947 and continued to be a member of the household until his death. She was a registered nurse. In November, 1947, when decedent sought medical advice he was suffering from a severe attack of jaundice. He refused to accept his physician's advice that he should seek hospital treatment and his condition grew progressively worse and on December 15, 1947 his physician diagnosed his ailment as cancer of the liver and from that time decedent was confined to his bed and was in a drowsy and toxic condition growing steadily worse. On December 24 his condition was so serious that his physician thought his death imminent and advised him to get his affairs in order at once. He lived sixteen days longer, each day growing weaker and he died in a coma.
"Two witnesses testified that Vollinger told them on several occasions beginning shortly after marriage to his wife and down to the fall of 1947 that he and his wife did not get along *Page 484 
happily and that he was dissatisfied with the way she treated him and in his probated will which is dated February 23, 1940, he stated, `To my wife, Agnes Vollinger, I give the sum of one dollar because during my lifetime she has been less than a wife to me and has been inconsiderate and neglectful of her wifely duties.' Following that advice of his physician given him December 24 that he should get his affairs in order, he sent for complainant Vanderbach who had been his friend and attorney for fifteen years and complainant came to him on December 25 and was told by decedent that he desired to add a codicil to his will because his wife and stepdaughter were after him to convey his property to them and he was not going to do it but would leave his wife $3,000 and his stepdaughter $100 because she was giving him some nursing care. The codicil was drawn and executed that day and by it decedent provided, `I give my wife, Agnes Vollinger, in addition to the legacy given her in the aforesaid will, the sum of three thousand dollars and I give to her daughter the sum of one hundred dollars.' The execution of the codicil was witnessed by complainant Vanderbach and his brother and both testified that on that occasion decedent told them his wife and daughter wanted him to turn over his real estate to them but `they could go to hell'.
"The testimony of complainant William Vollinger, nephew of decedent, was that on visits to decedent December 15, 1947 and on subsequent occasions decedent told him that his wife and stepdaughter wanted him to sign everything over to them but he would not do it.
"The testimony by which the defendants seek to show that the conveyance by decedent of all his real property and the gifts of all his money in bank, which conveyance and gifts left him with no assets whatever, were the voluntary acts of a man capable of understanding the effect and consequences of the acts in which he was engaged and were performed without undue influence exerted on him, is as follows:
"Mrs. Vollinger's testimony was that during their whole married life her husband was good to her, treated her nicely and never complained about anything. He was sick the whole *Page 485 
summer of 1947 and got no better but was failing in health and weak. She became concerned about her future and asked him three times to turn over his property to her, the first time being early in December, 1947 and he told her not to worry that he would take care of her and would give her the two houses. Her second request was made the end of December and he told her he would give her the houses and money and that she would get everything, and the third request was in January. She knew Vanderbach had called on her husband Christmas Day at her husband's request but did not know the purpose of the call and when she spoke to her husband in January about giving her his real property he told her to get any lawyer and she asked him if she should get Vanderbach and he said no. She knew no lawyer and her daughter got one who came to the house January 3 and she introduced him to her husband. The lawyer had a prepared deed with him and she was in the room when her husband signed it.
"The story told by Miss Sharvat is that as a nurse she took care of decedent from August, 1947 until his death and was told by decedent's physician December 15 that decedent was suffering from cancer of the liver. Decedent grew steadily worse in health and early in December told her he did not expect to live long. She heard her mother ask decedent if anything happened to him would she (the mother) be taken care of and heard decedent reply that he would give her mother the two houses and that decedent made that statement again December 26. She heard decedent's physician tell decedent December 24 that decedent had better straighten out his affairs and at decedent's request she summoned Vanderbach and told him decedent wanted to make a will or give her mother something by will and after Vanderbach's call on decedent the latter told her he had given money to his wife and to her, she understood by will. She further testified that on December 26 decedent informed his wife he was going to sign the two houses over to her and told her to call in any lawyer she wanted, whereupon she did not communicate with Vanderbach although she knew he was decedent's lawyer, but *Page 486 
called on a lawyer of her acquaintance and informed him that decedent desired to convey his property to her mother. That lawyer came to the house January 3 with a prepared deed which decedent then executed.
"The lawyer was a friend or acquaintance of Miss Sharvat but an utter stranger to decedent. Miss Sharvat first communicated with him December 31 telling him decedent wanted to transfer his property to her mother. She was unable to give him a proper description of the property and he obtained one from the record, prepared the deed, called on decedent January 3 by appointment made with Miss Sharvat found decedent in bed and was introduced to him by Mrs. Vollinger as the lawyer who had prepared the deed for the property. The lawyer discussed the deed with decedent, ascertained by questioning that decedent had no other real estate, learned from decedent that decedent had some cash in the house and money on deposit in bank. He was questioned by decedent as to who would have charge of the property after he had executed the deed and whether his wife could transfer the property and he informed decedent that his deed would be an absolute transfer of the property and that his wife would have charge and control of it and that she could not transfer the title unless he signed the deed with her. The lawyer was satisfied from his conversation with decedent that decedent was mentally competent to execute a deed and so the deed was executed, the lawyer testifying that although Mrs. Vollinger was in and out of the room on several occasions she was not present when the deed was signed. The decedent did not inform the lawyer why he was making the conveyance and the lawyer was not asked for advice as to the advisability of the act in which decedent was engaged and gave none. The lawyer's testimony was that he was with decedent from 12:30 p.m. to 2:00 p.m. on this occasion and took the deed and recorded it. I make note here of the testimony of a witness who was one of decedent's tenants, that she went to decedent's home January 3 about 6:00 p.m. to pay rent and was shown to decedent's bedroom by Miss Sharvat; that decedent was in bed and unconscious and did not recognize her; that she called Miss *Page 487 
Sharvat's attention to that fact and Miss Sharvat told her decedent was in such pain he had to be kept `doped up.'
"The decedent has $4,411.64 on deposit in Hudson Trust Co. and by check dated January 5, 1948 drawn against that account to the order of Miss Sharvat he withdraw $3,000, and by check dated January 8 drawn against that account to the order of Mrs. Vollinger he withdrew the balance of $1,411.64. His other account was in the Guttenberg Bank and Trust Co. for a total of $2,932.58 and by check dated January 7, 1948 drawn against that account to the order of Mrs. Vollinger, he withdrew $2,918.49. At that time an interest credit of $14.90 had not been entered in his bank book and that sum was withdrawn by his check dated January 8 to the order of Mrs. Vollinger. The testimony of Mrs. Vollinger was that after decedent had conveyed his real estate to her he told her he had to give her his money in bank to take care of the houses and at his direction she got his bank books and gave them to him and he told Miss Sharvat to fill in bank drafts for him to sign, which she did and all drafts against the two bank accounts are in Miss Sharvat's handwriting, but bear decedent's signature. The testimony of Mrs. Vollinger and Miss Sharvat is that Miss Sharvat obtained all the money on those drafts and gave all of it to decedent who handed the $3,000 from the Hudson Trust Co. account to Miss Sharvat telling her he gave it to her because she had been nursing him and had been good to him for many years, and the balance of the withdrawals he gave to Mrs. Vollinger to take care of the property decedent had given her but Miss Sharvat also testified that decedent told his wife he had left her $3,000 by will and to make sure she should get it he wanted her to take it out of the bank so that she should have no trouble after his death.
"The impression made on my mind by all the testimony is that on December 25 Mrs. Vollinger and Miss Sharvat knew that decedent had called in his lawyer Vanderbach for the purpose of engaging in a testamentary transaction and that they feared that by such transaction they would be excluded from sharing to any great extent in decedent's estate and that they then proceeded to execute a plan to take over decedent's *Page 488 
assets for themselves and thus defeat decedent's testamentary intention. I disbelieve their testimony that decedent reversed his determination as declared to others and as evidenced by his will and, in part, by his codicil not to give his estate to his wife and stepdaughter and within a few days after executing his codicil volunteered to convey his real estate to his wife and to transfer his bank accounts to her and to his stepdaughter. I do not believe he understood the act of conveyance and the signing of drafts against his bank accounts. On and after December 25 he was under their sole dominion and control and in his weak, feeble and dying condition I believe he was unable to resist, even if he understood, their importunities and that they were able to induce him to agree to execute any paper they presented to him. However that may be there are certain well established rules of law which must be observed in connection with gifts made under the circumstances here shown to exist, in order that such gifts can be sustained as valid.
"Where the donor is aged and is feeble in body and is so placed that he is more or less dependent on the donee or is likely to be subjected to the influence of the donee, the courts require clear, convincing and satisfactory proof of the fact that the donor fully understood his voluntary disposition of property in favor of the donee and that it was not done through the influence of the donee (Haydock v. Haydock, 34 N.J. Eq. 570; Slack v.Rees, 66 N.J. Eq. 447; Post v. Hagan, 71 N.J. Eq. 234;Bauer v. Cron, 71 N.J. Eq. 743; Croker v. Clegg,123 N.J. Eq. 332). Here the burden was on defendants to show that the gifts in question were the voluntary and intelligent act of the decedent and this they attempt to do by their uncorroborated testimony which I regard at least with suspicion (Berg v.Baldwin, 84 N.J. Eq. 90, affirmed 84 N.J. Eq. 193; Heyer v.Sullivan, 88 N.J. Eq. 165, affirmed 88 N.J. Eq. 595;Madison Trust Co. v. Allen, 105 N.J. Eq. 230, affirmed107 N.J. Eq. 183). I cannot accept that uncorroborated testimony as sufficient to overcome the evidence presented by the testimony of witnesses and the decedent's *Page 489 
will and codicil that the decedent, when in his right mind, never had such donative disposition toward the defendants.
"The defendants present the relationship that existed between decedent and Mrs. Vollinger as pleasant and congenial and that decedent lived in trust and confidence not only with his wife but with his stepdaughter. Another rule of established law is that where in such a situation the donor strips himself of all or nearly all of his property a presumption exists that he did not fully understand and appreciate the effect of his act or its legal consequences to himself and there is cast on the donee the duty of showing that the donor had the benefit of competent and independent advice before he acted (Slack v. Rees, supra; Postv. Hagan, supra; Alberts v. Alberts, 119 N.J. Eq. 391;Peppler v. Roffe, 122 N.J. Eq. 510; Croker v. Clegg,supra). And proper and independent advice means that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person so disassociated from the interest of the donee as to be able to advise with the donor impartially and confidentially as to the consequences to himself of his proposed benefaction (Post v.Hagan, supra; Soper v. Cisco, 85 N.J. Eq. 165). Here the donor, if he actually proposed to make the gifts in question, had no advice whatever on the alleged gifts of his bank accounts which were the final steps in stripping him of all his assets and he was deprived of the privilege of conferring with Vanderbach, his legal adviser of many years, with respect to the conveyance of his real property by Miss Sharvat's refusal to call Vanderbach in and that act on her part creates the suspicion, if not the belief, that she did not want decedent to have independent advice. Instead she called in a lawyer who was associated with the interest of her mother and herself and that lawyer had no preliminary consultation with the donor before coming to him with a deed prepared at Miss Sharvat's direction. While the lawyer did not attempt to deceive or mislead the donor, I doubt that he fully understood or cared what the practical consequences of the donor's act might be to the donor. He was not asked to give the donor any advice and he gave none and he did not explain whether the donor could continue *Page 490 
to reside in his home or suggest that the donor reserve a life estate or make the proposed disposition by a will with the safeguards surrounding such disposition, and his statement that decedent's wife could not convey the property without decedent's signature on the deed of conveyance was not accurate. The fact that decedent died six days after executing the deed and one day after disposing of the last of his money in bank is not determinative (Alberts v. Alberts, supra).
"The complainants are entitled to a decree setting aside the conveyance made by decedent to his wife and adjudging that the complainant executor is entitled to all money withdrawn by decedent from his bank accounts and received by defendants and directing that the defendants pay to the complainant executor the money so received by them respectively. It appears that Mrs. Vollinger expended some of the money received by her for the payment of decedent's funeral expenses, debts and other purposes. She should be allowed for such expenditures as would have been proper charges against decedent's estate and if counsel for the parties cannot agree on the amount Mrs. Vollinger should be decreed to pay to the complainant executor, I shall refer it to a master to ascertain such amount."
The decree will be affirmed for the reasons expressed in the opinion of Vice Chancellor Fielder in the former Court of Chancery.
For affirmance: Chief Justice VANDERBILT and Justices CASE, HEHER, WACHENFELD, BURLING and ACKERSON — 6.
For reversal: None. *Page 491