ABRAM WEISBERG, ADMINISTRATOR OF THE ESTATE OF YETTA KOPROWSKI, ALSO KNOWN AS YETTA WEISBERG, DECEASED, PLAINTIFF-RESPONDENT, v. CAROLINE KOPROWSKI, DEFENDANT-APPELLANT.

Argued January 3, 1955—Decided January 31, 1955.

366

*Mr. Louis Santorf* argued the cause for appellant.

*Mr. Harry Chashin* argued the cause for respondent (*Messrs. Marcus & Levy,* attorneys).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   In 1941 Morris Koprowski purchased houses at 209 and 214 Carroll Street in Paterson, taking title in the maiden name of his mother Yetta Koprowski, *née* Weisberg.   This appeal is here on certification granted, 16 *N. J.* 192 (1954), the defendant Caroline Koprowski, the widow and sole heir of Morris, from a judgment of the Appellate Division which reversed a Chancery Division judgment declaring that Yetta held the title to the properties subject to a resulting trust in favor of Morris, and that Caroline is entitled to the properties.

Morris died in 1943, intestate, survived by Yetta and Caroline.   Morris and Caroline had no children.   Yetta, widowed before the first World War, had come to America with Morris and Caroline from England in 1919.   The three lived, after 1921, in a home at 51 Carroll Street purchased by Morris in his and Caroline's names and at which address he and Caroline carried on a successful barber and beauty shop. They were a harmonious trio, devoted to one another.   Yetta suffered from Parkinson's disease and Morris and Caroline

were particularly solicitous of her welfare on that account. Yetta and Caroline continued their close relationship after Morris' death, living together at the homestead until Yetta died, also intestate, in 1950.

Of record at Yetta's death, in addition to the titles to the houses at 209 and 214 Carroll Street, was a $3,000 mortgage, also in her maiden name, on the homestead at 51 Carroll Street. The mortgage had been assigned to her by a former holder in 1939.

The instant action began as a proceeding by plaintiff, Yetta's nephew and the administrator of her estate, to foreclose the $3,000 mortgage. Caroline's defense was that Yetta took the assignment of the mortgage on trust for her and Morris and simultaneously with the assignment had executed a formal discharge of the mortgage, which discharge, however, had not been recorded. Caroline also counterclaimed that the properties at 209 and 214 Carroll Street were held in Yetta's maiden name subject to a resulting trust for Morris.

There have been two trials of the case. At the first trial the court dismissed both complaint and counterclaim. The judge found that Caroline's defense to the foreclosure suit was established by the proofs, but that on the counterclaim she had not proved the basic required fact to show a purchase price resulting trust, namely, that Morris had paid the purchase price for the properties at 209 and 214 Carroll Street.

The source of the cash payments toward the purchase price of the properties was a bank account in Yetta's maiden name. The trial judge was not satisfied that the proofs offered at the first trial showed that this account actually belonged to Morris. Morris had opened the account with his funds in 1934, taking a power of attorney from his mother authorizing his withdrawal of funds therefrom. It reasonably appears that the account was opened by Morris in his mother's maiden name primarily to put him in a position to acquire the $3,000 mortgage on the homestead at less than its face value without disclosing that he was the actual purchaser.

The mortgage was held by a California resident who was pressing for its payment. Several years of negotiations by correspondence ensued, from 1934 to 1939, before Morris finally succeeded in reaching agreement with the holder to accept $2,500 for the mortgage. This sum was paid with Yetta's check for $2,000, prepared by Morris and drawn on the account, plus $500 cash provided by Morris. The acquisition took the form of an assignment of the mortgage to Yetta in her maiden name. The discharge of the mortgage executed by Yetta at that time was not recorded because Morris desired to be in a position to use the mortgage as collateral if he borrowed money.

The only other withdrawals from the account were three made in connection with the purchase of the 209 and 214 Carroll Street properties, and 13 withdrawals of interest, made as interest on the deposit periodically accrued and was credited to the account. The cancelled checks evidencing the withdrawals in connection with the purchase of the properties were produced at the first trial; but the slips evidencing withdrawal of interest could not be located at that time, and there was no evidence satisfactory to the trial judge that Morris in that wise asserted control of the account through exercise of his power of attorney.

The three checks issued in connection with the purchase of the properties were prepared by Morris and signed by Yetta. The purchase prices of 209 and 214 Carroll Street were $5,500 and $5,000, respectively. When Morris in 1941 submitted a single bid for both properties he transmitted with his bid Yetta's check, prepared by him, for $1,050, or 10% of the aggregate purchase price. The balances were paid by Yetta's bond and mortgage for $3,850 and $3,500 on the respective houses and Yetta's checks, prepared by Morris, for $1,136.39 and $1,130.90 which included an excess over the full purchase price representing adjustments.

The trial judge did not consider at the first trial that the evidence of Morris' preparation of the checks on the account,

and the other proofs mentioned, sufficed to support a finding that the account belonged to Morris and not to Yetta.

After Caroline appealed the dismissal of the counterclaim to the Appellate Division, the bank which, through merger, had succeeded to the affairs of the bank where the account was maintained, found the 13 withdrawal slips showing that Morris, using his power of attorney, made 12 of the 13 withdrawals of interest credited to the account in his lifetime. Withdrawal of interest as soon as it was credited was a business practice followed by Morris in connection with bank accounts he maintained in his own name. Upon Caroline's motion in the Appellate Division to make this evidence part of the record, that court declined to take the evidence, but stayed the proceedings on the appeal pending an application by Caroline to the Chancery Division for a new trial on the ground of newly discovered evidence.

Not only Caroline, but the plaintiff as well, moved to reopen the judgment, and for a new trial on the ground of newly discovered evidence. Both motions were granted, and the second trial followed. The record made at the first trial was supplemented with evidence concerning the interest withdrawals and the 13 withdrawal slips were marked in evidence.

At the conclusion of the second trial the trial judge entered a new judgment, again dismissing the foreclosure complaint, but granting Caroline the relief sought on the counterclaim. On plaintiff's appeal from that judgment the Appellate Division sustained the dismissal of the foreclosure complaint (plaintiff did not seek certification from that action) and, as mentioned, reversed the judgment on the counterclaim.

I.

Plaintiff argues that the Appellate Division erred in staying the proceedings on defendant's first appeal and remanding the case to permit the application for a new trial. Having availed himself of that same remand to make a like

application, it is questionable whether plaintiff should be heard to make that argument. At all events, the argument is without merit. It is familiar appellate practice to remand cases for further proceedings and further evidence where justice demands that course. *Giacchi v. Richmond Brothers Co.*, 12 *N. J. Super.* 308 (*App. Div.* 1951).

The interest withdrawal slips were vital evidence showing control of the account justifying, with the other circumstances, the inference that the funds on deposit were really the funds of Morris. The inability of the defendant, despite due diligence, to obtain the slips at the first trial, coupled with the uncontradicted evidence that the successor bank located the slips after the appeal was taken when that bank undertook to microfilm the records of its predecessor, were ample support for the Appellate Division's exercise of its broad discretionary power to remand. *Cf. State v. Pillo*, 15 *N. J.* 99, 105 (1954).

And the same showing in the trial court was sufficient warrant for the allowance of a new trial on the grounds of newly discovered evidence. The elements which must coalesce to entitle a party to a new trial for newly discovered evidence fully appear. *State v. Hunter*, 4 *N. J. Super.* 531, 537 (*App. Div.* 1949). The withdrawal slips cast a definite light upon the ownership of the account; that they were material evidence capable of changing the result is conclusively established from the fact that upon the record made after they were received the trial judge concluded, contrary to his finding on the first trial, that "The money with which the property was purchased was that of Morris Koprowski. It came from the account which he had established with his own funds and over which he exercised control."

On the plaintiff's appeal from the second judgment the Appellate Division questioned the sufficiency of even this new evidence to establish Morris' ownership of the account, stating, "Whether in the present case the moneys utilized to purchase the two properties belonged to Morris or were the treasure which Yetta had previously acquired from Morris

is not a question intrinsically free from all rational doubt." This was not an independent finding of fact. See *R. R.* 1:5-4(*b*). Our review of the record satisfies us that the trial judge's finding is fully supported by the evidence, and no reason appears why it should be disturbed. There was evidence that when Morris intended a gift to his mother of other moneys on deposit he did not employ the unusual device of putting the account in her maiden name but simply added her marriage name, Yetta Koprowski, jointly with his own. He did this as to two substantial bank accounts, and plaintiff has not questioned that in those instances Yetta succeeded, by survivorship, to the large balance of the one remaining upon the death of Morris. It is also significant that Yetta after Morris' death made no withdrawal, of interest or otherwise, from, or in any manner dealt with, the account in her maiden name. All of the circumstances point to the creation of the account by Morris and the use of his mother's maiden name thereon to provide a strawman for his personal investment transactions, and oppose the inference of a gift to his mother.

## II.

■ Essentially, the Appellate Division reversal rests upon the view that, even assuming that Morris used his funds to buy the properties, the proofs did not justify a finding that he intended a resulting trust, but rather indicated an intent on his part to make a gift of the properties to his mother. Here too we think there was ample support for the trial judge's finding of an intended resulting trust, and see no reason why that finding should be disturbed.

■ The general rule is that a resulting trust will be declared in favor of the one paying the purchase price of property transferred to another unless it is shown that the one paying the price manifested an intention that no resulting trust should arise. 2 *Restatement, Trusts* (1935), *pp.* 1343, 1347; *2A Bogert, Trusts and Trustees* (1953), *p.* 419; 4 *Pomeroy's Equity Jurisprudence* (5th ed. 1941), *p.* 71;

4 *Powell, Real Property* (1954), *p.* 551; and see New Jersey cases collected by Judge Jayne in *Fowler v. Scott,* 8 *N. J. Super.* 490 (*Ch. Div.* 1950). However, where one of certain relationships, usually of blood or marriage, exists between the payor and the transferee, the inference to be drawn is not of resulting trust but of gift or advancement, and the burden is upon him who claims a resulting trust to show that the payor manifested an intention that the transferee should not have the beneficial interest in the property. The modern test of relationship which will raise an inference of gift is whether the transferee is a natural object of the bounty of the payor. *Restatement, supra, pp.* 1355 *et seq.*; 3 *Scott, Trusts* (1939), *p.* 2256 *et seq.* Thus, a gift or advancement is presumed where a husband takes title in the name of his wife, *Lipp v. Fielder,* 72 *N. J. Eq.* 439 (*E. & A.* 1907); *Gorrell v. Gorrell,* 97 *N. J. Eq.* 367 (*E. & A.* 1925), or a father in the name of his son, *Brower v. Brower,* 98 *N. J. Eq.* 218 (*Ch.* 1925), affirmed 99 *N. J. Eq.* 414 (*E. & A.* 1926), or a stepfather in favor of a stepchild, *Mott v. Iossa,* 119 *N. J. Eq.* 185 (*Ch.* 1935).

But the usual inference of a resulting trust and not of a gift is said to arise where the wife is payor and takes title in the name of her husband, or, as in the instant case, where the child purchases the property and takes title in the name of his parent. *Pinkinson v. Pinkinson,* 93 *N. J. Eq.* 583 (*Ch.* 1922); *Restatement, supra, sec.* 442, *comment* (*a*), *pp.* 1356–6.

Most authorities are agreed that the application of the rule inferring a gift to a transferee related to the payor is not to be determined on considerations of the closeness of the relationship or the extent of natural affection, nor by reason of any legal obligation to furnish support. As Professor Scott has observed, *Scott, supra, p.* 2259, closeness of the relationship or the extent of natural affection is an unsatisfactory test. "It cannot be laid down as a rule of law that husbands have a greater affection for their wives than wives have for their husbands." The same is true of

child and parent, yet many decisions, including *Pinkinson v. Pinkinson, supra,* say that the law should infer that parents intend to make gifts to their children, but not that children intend to make gifts to their parents. And the test of a legal obligation of support is equally unsatisfactory, since where a parent purchases property in the name of his child "a gift is presumed even though the child is an adult to whom the parent owes no duty of support." *Ibid.* These incongruities explain the preference of modern decisions for a determination based upon whether the grantee is a natural object of bounty of the payor, that is, *Restatement, supra, comment (a), pp.* 1355–1356, whether he stands in such a relationship "that it is probable that the payor intends to make a gift to the transferee" or, in Professor Scott's phrasing, "that it would be natural to make provision for his advancement." *Scott, loc. cit.*

The facts of the relationship between Morris Koprowski and his mother Yetta could well justify a finding that she was in fact a natural object of her son's bounty within this test. She was a woman seriously ill from Parkinson's disease through most of the almost quarter-century before the death of Morris, during which she lived with Morris and Caroline, and the record is replete with evidence that the constant and devoted attention given her by both was the greater because of her ill health. She had no means of her own, and whatever she acquired and had at her death was what had been generously given her by her son and his wife. "So much depends not upon the formal relationship between the parties but upon their attitudes to each other." *Scott, supra, p.* 2259. This family, as the Appellate Division observed, lived "in the spirit of what is mine is thine." Their relationship was such that, but for other evidence overcoming the inference, the probability might well be inferred that Morris did intend a gift of the properties to Yetta.

However, neither the inference of resulting trust nor the inference of gift is compelled merely because the proofs suffice to raise one of them. Caroline, on her brief, properly

acknowledges the soundness of the principle enunciated in the Appellate Division's opinion that either inference, or, perhaps more accurately, presumption, "where applicable, merely serves to erect a *prima facie* case for the party in whose favor it exists and to point out the party who has the duty of going forward with proof"; in other words, the presumptions are not to be accorded undue weight as hard and fast rules requiring one or the other conclusion. In truth, the question of gift or trust is a matter of intention and the court's quest is to discover the payor's intention as revealed by all the circumstances.

Either presumption may be rebutted and overcome by proof of events leading up to and culminating in or accompanying the transfer of title and, while transactions wholly subsequent to the transfer cannot establish the base for the conclusion, the subsequent conduct of the parties may be given in evidence to corroborate the inference drawn from prior and contemporaneous circumstances. *Killeen v. Killeen,* 141 *N. J. Eq.* 312 (*E. & A.* 1948); *Yetman v. Hedgeman,* 82 *N. J. Eq.* 221 (*Ch.* 1913); *Pomeroy, supra, p. 69; Scott, supra, p.* 2261.

In the instant case it was shown that Morris had previously owned 209 Carroll Street and had operated it as a rooming house. He bought it in his own name in 1926 for $17,000 subject to a $12,000 mortgage held by Investors Title & Mortgage Company of Paterson. As the Great Depression of the 1930's worsened he was unable to meet expenses from operations or to satisfy therefrom the demands of the mortgagee for reduction of the mortgage. Finally, in May 1941 he conveyed the house to the mortgagee under a deed providing that the conveyance was subject to the mortgage. He took back a one-year lease in his mother's maiden name but continued personally to manage the property as a rooming house for his own profit. The mortgagee tried unsuccessfully during the summer of 1941 to auction the house in combination with the residence across the street at 214. Thereafter Morris began negotiations with the mortgagee to buy back

209 at a low price. The mortgagee was willing to sell to Morris, but not in his name because of concern that an adverse reaction might arise to a resale to the individual who had conveyed to it because of inability to meet from operations the payments of the $12,000 mortgage. Morris asked his close friend, Louis Berman, to take the title in his name, to which Mr. Berman agreed; but the plan failed because Mr. Berman was married and did not want to involve his wife in title complications. Morris then decided to take the title in his mother's maiden name and this was satisfactory to the mortgagee. In the final negotiations Morris agreed also to buy 214 Carroll Street, and the transactions already described ensued and included the discharge of the former $12,000 mortgage. Morris paid all expenses of the transfers, including attorneys' fees and cost of searches.

After title was taken in his mother's maiden name Morris continued the management in his own interest of 209 as a rooming house and invested considerable sums from his own funds in the conversion of 214 into a similar establishment. Yetta expended no moneys. Until his death Morris made all the payments on the bonds and mortgages, paid all taxes and carrying charges, collected the rents from the roomers and neither accounted to Yetta nor was asked by her to account. In short, Morris exercised all of the rights and duties of ownership of both properties.

"The intention that the grantee should not have the beneficial interest in the property may appear from the circumstances at the time of the purchase or it may appear from the subsequent conduct of the parties. The intention not to make a gift may appear from the conduct of the payor in exercising dominion over the property, his collection of the rents, payment for improvements, payment of insurance premiums and taxes." *Scott, supra, pp.* 2261–2262.

After the death of Morris and during the seven years before Yetta died in 1950 Caroline carried on the operations, and Yetta never questioned her exercise of dominion and control. While the income from the properties was reported in Yetta's federal income tax return, Morris in his lifetime and Caroline

thereafter paid those taxes and the returns were prepared by their accountant from information furnished by them.

There are countervailing bits of evidence urged upon us by plaintiff: Caroline did not report the properties in the inheritance tax return she prepared and filed for Morris' estate; the telephone and gas and electric accounts, and the insurance policies on the houses were in Yetta's name; after Morris' death, Yetta, who, at Caroline's insistence because of her Parkinson's disease, always accompanied Caroline on the business of the houses, made a few small payments to a plumber and a janitor, and was seen on occasion to receive the rent moneys from Caroline after Caroline collected them and returned to the car where Yetta was waiting. These proofs hardly compare in quality or force with the circumstances above outlined which established an appropriate case of resulting trust. *Killeen v. Killeen, supra.*

## III.

Plaintiff argues that because Morris paid only 30% of the purchase price of the properties and the balance in each instance is represented by Yetta's bond and mortgage, the finding of a resulting trust is wholly precluded or at least limited to a resulting trust "in proportion to his payment." He cites Massachusetts decisions which he interprets to lay down a rule that "where a mortgage is given back to the seller by the grantee for a part of the purchase money, the principle of resulting trust does not apply at all."

Plaintiff has overlooked the decision of the former Court of Errors and Appeals in *Killeen v. Killeen, supra.* In that case John Killeen and wife desired to buy a property for $4,000 but had no means to finance the purchase and because of outstanding judgments could not secure mortgage financing in their own names. They arranged to have John's younger brother James take title and with his wife give back a bond and mortgage for the full purchase price. The only moneys expended by John were the deposit paid upon execution of

the contract in James' name, the fees and disbursements in connection with the mortgage transaction, and the attorney's fees. James expended no moneys. John and his wife went into possession of and operated a tavern business on the property, and later moved into the dwelling portion of the property. John and his wife made all the payments under the bond and mortgage, paid all the taxes and carrying charges, collected the rents and never accounted to James nor were asked by him so to do. A resulting trust in favor of John and his wife was held to be established on these facts. James argued that the rule of resulting trust "does not apply in the instant case, because the entire purchase price came from the proceeds of the bond and mortgage executed" by James and his wife. The argument was held to be without merit. The court said (141 *N. J. Eq.*, at *page* 315):

"* * * The accepted rule is thus declared in *Restatement of the Law of Trusts*, § 456-F, *page* 1394: 'Where property is sold and a part of the purchase price is paid in cash by a person other than the transferee and the balance is secured by a purchase money mortgage on the property, the fact that the transferee executes the mortgage and incurs an obligation to the vendor for the balance of the purchase price does not of itself entitle him to a beneficial interest in the property. In such a case the inference is that the other person, who is the real purchaser, undertakes to exonerate the transferee from any liability to pay the vendor the deficiency if on foreclosure of the mortgage the property should be insufficient for the payment of the balance of the purchase price.'"

The trial court in the *Killeen* case, like the trial court here, did not, however, provide for exoneration of the grantee from liability under the bond and mortgage. The former high court accordingly remanded the cause for appropriate proceedings in that regard, saying (at *pages* 315–316):

"* * * While the inference is that the liability for the obligation *inter sese* is primarily on the respondents [John and his wife], nevertheless, the decree should have expressly provided for the discharge or release of the appellant [James] and his wife, the obligors, from liability for the debt or exoneration from liability for any deficiency which might arise."

The record in the instant case does not disclose whether any balances remain due on the mortgage debts. The reinstatement of the judgment of the trial court will therefore be with leave to the plaintiff within ten days after the sending down of the mandate to apply to the trial court to supplement the judgment appropriately to provide for the discharge or release of Yetta's estate from any remaining liability for the debts or exoneration from liability for any deficiency which might arise.

## IV.

Plaintiff argues that Caroline should be denied relief, for unclean hands, contending that Morris, possessed at the time of ample means to pay the original $12,000 mortgage on 209 Carroll Street, either by fraudulently misrepresenting his true financial position or by connivance with an executive of Investors Title & Mortgage Company, effected the discharge of that mortgage and the conveyance back of that property at a substantially depreciated price. There is not a vestige of proof of the fraudulent acts suggested. In fact it abundantly appears that Investors was fully aware of the whole situation and in the then depressed real estate market was glad to receive the price paid. And see *Gerace v. Gerace*, 301 *Mass.* 14, 16 *N. E. 2d* 6, 117 *A. L. R.* 1459 (*Sup. Jud. Ct.* 1938).

## V.

Plaintiff urges that Caroline is barred from recovery by laches in failing to assert her claim against Yetta during the almost seven years that elapsed between the deaths of Morris and Yetta. But the defense of laches is not regarded with favor where the parties stand in a confidential relation. *Matarrese v. Matarrese*, 142 *N. J. Eq.* 226 (*E. & A.* 1948). Such was the obvious relationship of this trio in Morris' lifetime and the bond between Yetta and Caroline was, if anything, stronger after his death. It is plain, too, that

Caroline had little reason to believe that anyone but herself would interpose a claim to the properties or inherit them after Yetta's death. The plaintiff Abram, son of Yetta's brother, did not appear on the scene until less than a year before his aunt's death when he brought his family here from Europe. Laches clearly should not be invoked against Caroline in the circumstances, particularly in the light of the strong proofs pointing to the intention of a resulting trust. It cannot here be said that plaintiff's case materially suffered from the loss of Yetta's testimony through death or that Caroline's tardy assertion of her rights so prejudiced plaintiff that it is unjust to allow Caroline to vindicate her claim. *Cf. Cousens v. Cousens*, 136 *N. J. Eq.* 224 (*E. & A.* 1945).

## VI.

Finally, plaintiff contends that Caroline's appeal should be dismissed for her failure to comply with governing rules pertinent to appeals. He refers to her failure to serve and file the requisite number of volumes of appendix, *R. R.* 1:10–10(*a*), and complains that she did not print as much of the record as plaintiff could reasonably assume would be printed. *R. R.* 1:7–1(*f*); *R. R.* 1:10–9.

The filing of nine rather than of 12 copies of the appendix was not prejudicial to plaintiff and is excusable in the special circumstances of this case. The appendix consists of two volumes totalling 419 pages and was printed originally for use on the first appeal to the Appellate Division. Caroline applied for and was granted leave by this court to use the appendix with her petition for certification because of her financial inability to pay the cost of reprinting. It developed that, contrary to her first impression, she was able to gather together only nine clear copies; she had sold most of the copies to plaintiff for use on his appeal from the second judgment.

And we find no substance in plaintiff's contention that defendant should have printed the material provided in

plaintiff's appendix. That material embraced the proceedings in the Appellate Division and in the trial court leading to the second trial and excerpts from the transcript taken at that trial. Plaintiff had printed the material on his appeal to the Appellate Division from the second judgment in support of his point that the allowance of the second trial was error. The Appellate Division ruled in defendant's favor on the point and defendant thus had no reason to print the proceedings in connection with her petition for certification which sought review only of the determination that there was no resulting trust. Plaintiff, on the other hand, availed himself of the opportunity which was his to argue here any and all points which would sustain his judgment, *State v. Lefante*, 14 *N. J.* 584 (1954), and clearly printed his appendix for that purpose. We find in the circumstances no violation by defendant of *R. R.* 1:7–1(*f*), made applicable to petitions for certification by *R. R.* 1:10–9 and providing that the appendix "shall contain such parts of the record as are essential to the proper consideration of the issues, and which the appellant desires the court to read, including such portions which the appellant reasonably assumes will be relied upon by respondents in meeting the issues raised." The "issues raised" within the meaning of this rule, as applied to an appellant on certification, are the questions on which he sought certification, to which questions his argument on appeal must be limited. *State v. Lefante, supra.* They do not include other issues which respondent may urge to sustain his judgment even though the appellant has reason to know the respondent will rely upon them.

Reversed, with direction to reinstate the Chancery Division judgment of July 7, 1953, with leave to plaintiff to apply to supplement the reinstated judgment as provided in Point III of this opinion.

Heher, J. (dissenting). The judgment of my colleagues proceeds on the hypothesis of a rebuttable presumption, not of a resulting trust, but rather of a gift of the subject matter

of the transfer, for it is held that the "facts of the relationship between" the deceased and his mother "could well justify a finding that she was in fact a natural object of her son's bounty," and "their relationship was such that but for other evidence overcoming the inference, the probability might well be inferred that Morris did intend a gift of the properties to Yetta."

But with this assessment of the proofs I am unable to agree. I concur in the findings of Judge Jayne for the Appellate Division.

We enter into this inquiry guided by this basic principle: Even though the grantee is so related to the payor as to be the natural object of his bounty, parol evidence is admissible to rebut the presumption of a gift and to show that a trust was intended; and the intention that the grantee should not have the beneficial interest in the property may appear from the circumstances at the time of the purchase or it may appear from the "subsequent conduct of the parties," and thus automatically a resulting trust is created. *Scott on Trusts, section* 443.

I am convinced that Morris had in view the economic security of his widowed and infirm mother in case he predeceased her, which was the event. If she survived him, she would have financial security; if she predeceased him, her goods and property would be his. And it may well be that, notwithstanding her advanced years and infirmities and the law of probability, he was not reckoning with what ordinarily would be deemed a remote chance of her survivorship. We do not know. Morris died July 30, 1943, less than a year and a half after the conveyance to his mother of 209 and 214 Carroll Street, by several deeds some four months apart. In this regard, the second conveyance characterizes the first. The payments on the purchase price came in each case from Yetta's savings account in the United States Trust Company, opened June 7, 1934, with a deposit of $5,000 transferred by Morris from his own savings account in that institution, more than five years before the payment of the mortgage on

51 Carroll Street. The economic adversity of the early 1930's no doubt developed concern for his mother's security. And his mother was troubled. Caroline acknowledged on the witness stand that Morris "gave" his mother "$5,000 to make her happy." There was a conveyance to Morris' wife, Caroline, at the same time. 208 Carroll Street was acquired in Caroline's name in November 1941, largely through money withdrawn from their joint bank account; and Morris and Caroline held an estate by the entirety in 51 Carroll Street, where they lived and conducted their joint hairdressing and barbering business.

It is not important that Morris withdrew the accruing interest credits from his mother's bank account. The first withdrawal was made by Yetta; but she was afflicted with a serious progressive disease and, moreover, unversed in the ways of business, and it is but reasonable to suppose that her power of attorney to Morris was intended to serve her convenience. The large withdrawals to finance the purchase of the properties were all made by her.

But it is of prime if not controlling significance, I would suggest, that Caroline, as her husband's executrix, omitted 209 and 214 Carroll Street from her sworn return of the deceased's property and estate to the State Inheritance Tax Department. In the six and a half years intervening between Morris' death and his mother's, Caroline made no move to establish Yetta's trusteeship now asserted; and there was no action after Yetta's death until her executor brought this suit to foreclose the mortgage of record against 51 Carroll Street, when by counterclaim she pleaded the resulting trust of which enforcement is now sought.

It will not do to treat as indicia of dominion and control significant of beneficial ownership of the properties the ministrations of the son to his mother.

The burden is Caroline's to sustain the cause of action pleaded in the counterclaim; and in this, I submit, she has failed. The proofs are not sufficient to override the solemn record evidence of a transfer of ownership in all seeming

as a gift rather than a resulting trust. The normal implication of the transaction has not been overturned. I would refer to the observations of Professor Scott on the onus and standard of proof. *Section* 443, cited *supra*. It is to be presumed that Yetta, conscious of her ownership of the lands, designed their devolution according to the law governing intestacy.

I would affirm the judgment of the Appellate Division.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice HEHER—1.