793 A.2d 894

IN THE MATTER OF THE ESTATE
OF ELI MOSERY, DECEASED.

Superior Court of New Jersey
Appellate Division

Argued March 18, 2002—Decided April 4, 2002.

Before Judges HAVEY, COBURN and WEISSBARD.

*Gerard G. Brew* argued the cause for appellant *Bruria Mosery* (*McCarter & English,* attorneys; *Mr. Brew,* of counsel; *Mr. Brew, Kimberly J. Hines and Grace A. Lou,* on the brief).

*Michael T. Warshaw* argued the cause for respondents *Nathaniel Mosery and Zvi Mosery.*

The opinion of the court was delivered by

COBURN, J.A.D.

Eli Mosery, the decedent, died on August 15, 1995. He was survived by his widow, plaintiff Bruria Mosery, who had been his wife for over four decades, and by his four sons, Ilan, Nizan, Nathaniel and Zvi, the last two being the defendants in this action. About eight months before his death, Eli transferred all of his major assets, apparently worth at least $5 million, to his sons, leaving himself nothing and depriving his wife of any legal benefit from his estate. Asserting that the assets were transferred as a result of defendants' exercise of undue influence, plaintiff sought equitable relief. Ultimately, on defendants' motion for summary judgment, her complaint was dismissed on the ground of laches. She appeals, and we reverse.

I

On April 9, 1998, Ilan filed the initial complaint in the Chancery Division, Probate Part, pursuant to *Rule* 4:83, and an order to show cause was issued to all interested parties. On May 20, 1998, Bruria filed a certification supporting Ilan's requests for relief. Nathaniel and Zvi filed an answer; Nizan, however, has not appeared in the action. In October 1998, an amended complaint

formally named Bruria as an additional plaintiff. Subsequently, Ilan withdrew as a plaintiff.

Explication of the allegations in the complaint will be enhanced by a brief summary of certain undisputed events preceding and following Eli's death. On July 19, 1983, Eli executed a simple will leaving his estate to Bruria, with their children as alternate beneficiaries should she predecease him. On May 5, 1994, Eli executed a complex will, which, in essence, provided that: (1) Bruria would receive Eli's personal property; (2) Nathaniel, Zvi, and Nizan would receive Eli's shares of 598 Broadway Realty Assoc., Inc. ("Broadway Realty"); (3) Bruria would receive the benefit of a marital deduction trust; and (4) the balance of the estate would be divided among all the children. In December 1994 and January 1995, Eli transferred all of his major assets to his sons. Those assets consisted of the stock in two corporations, Broadway Realty and Broad Prince Realty Corp., each of which owned buildings in New York City. The value of the stock is alleged to be approximately $5 million.

The first count of the complaint asked that Eli's 1994 will be admitted to probate, challenged the validity of Eli's *inter vivos* transfers, and asserted that Bruria "was led to believe by [defendants] that she would be taken care of financially by them. Therefore, [she] never even sought to claim an elective share of the decedent's estate to which she could have been entitled ... pursuant to *N.J.S.A.* 3B:8–1 *et seq.*" The second count alleged that Nathaniel and Zvi had improperly caused the *inter vivos* transfers, asked that they be set aside, and requested an accounting. The third count alleged that the 1994 will was executed without testamentary capacity and asked that it be declared void. The fourth count asked that the 1994 will be declared void because it was the result of undue influence exerted on Eli by Nathaniel. The fifth count asked that the 1983 will be admitted to probate. All counts asked for "any and all other relief which this [c]ourt deems just and equitable." The amended complaint simply added Bruria's name.

Defendants filed their joint answer on May 22, 1998, and shortly thereafter, at the court's request, an affidavit providing additional information in support of their positions that probating the 1994 will was pointless since there were no assets in the estate at the time of Eli's death and that Bruria had acquiesced to the transfers which left the estate valueless. They asserted that Eli's major assets were the shares in the corporations that were distributed in December 1994 and January 1995. More to the point, they made the following assertions with respect to Bruria:

6. Prior to April 20, 1998, ... BRURIA MOSERY [has] enjoyed the benefits of the distributions made by [Eli] in December 1994 and January 1995.

. . . .

9. [T]he monies distributed from the various corporations to [BRURIA] from January 1, 1996, through May 20, 1997, total[ed] $148,746.18.

. . . .

11. Prior to January 1, 1998, our mother spent whatever amounts of money she wanted to spend in an unlimited fashion by charging them to her credit cards and receiving cash advances from her credit cards.

12. All of these bills were paid by the corporations gifted by our father to all of his sons.

13. In addition to the fact that our mother received $148,746.18, the economic value of the amount she received has been enhanced by the fact that the total amount was non-taxable, and the income taxes were paid by the various corporations.

. . . .

50. It can also be seen that our mother, BRURIA MOSERY, has received substantial benefits, as we promised, to support her from the assets gifted by our father. . . .

Their affidavit also described a number of lawsuits pending between them and Ilan in various New York courts regarding the corporate properties and related matters. It noted that a stipulation of settlement was entered in one of those actions on January 20, 1998, pursuant to which Ilan, on the one hand, and Nathaniel and Zvi, on the other, resolved their disputes over various corporate properties, at least one of which had been received from their father. The stipulation, apparently at Ilan's insistence, also provided that Bruria would receive $1,000 per week for the rest of her life from the corporate rentals.

Bruria was never a party to the New York action, although she was aware of its existence. Moreover, subsequent discovery revealed that the January 20, 1998 stipulation did not bring the New York litigation to a close. Further proceedings occurred, and another stipulation was executed on January 12, 1999, long after this case was filed. However, according to defendants' brief, notwithstanding the settlement efforts, "the New York litigation is [still] not concluded."

A critical event occurred in the late fall of 1995. Bruria and the defendants went to a lawyer's office for the reading of Eli's 1994 will. Bruria became upset when she then learned that she was not going to receive anything as a matter of legal right from Eli's estate. In her deposition, plaintiff gave the following testimony, describing what occurred immediately after the meeting:

> When we left [the lawyer's] office, and I was so upset, I came back with Zvi in his car. Zvi drove me home. He said to me, "Ma, it's no reason for you to cry. It's no reason for you to be upset. Everything is yours. It's only on paper. It's just for the tax purpose. It's just on paper. It's yours."
>
> So, I trusted him. I didn't have any reason whatsoever not to trust him. I spoke to him. I told him my fears. I told him my hopes. I told him everything. Absolutely nothing held back.
>
> And he said to me, "Ma, anything you need, just tell me."

She also certified that both defendants repeatedly assured her after Eli's death that she "would receive the assets and funds I was entitled to as the wife of Eli Mosery." And she added, "I was told on numerous occasions by Zvi and Nat Mosery that the assets of my husband belonged to me and that they would take care of the estate and I would receive the assets and the income and profits from those assets." She also testified that defendants assured her that "they would take care of the probate proceedings and provide and take care of [her] financially in the manner that [her] late husband had wanted . . . ."

## II

The numerous procedural steps preceding the motion for summary judgment need not be further detailed, other than to note

that early on the trial court had limited discovery to the issue of laches. As a result, we must assume for present purposes that the 1994 will was either executed at a time when Eli lacked testamentary capacity or was the product of defendants' undue influence. Similarly, we must assume that the later transfers occurred as a result of defendants' use of undue influence.

On August 21, 2000, the trial court filed a written opinion resolving the issue of laches in favor of defendants.

The trial court said that for purposes of the motion it was accepting as true Bruria's deposition testimony. It began its analysis by then determining that "the applicability of the doctrine of laches should be viewed in light of plaintiff's delay from the Fall of 1995 to September 1998 [when Ilan filed a formal motion asking that Bruria be allowed to intervene as a plaintiff], a period of approximately three years." [1]

Turning to the subject of Bruria's conduct, the trial court made the following determinations:

> Plaintiff's only explanation for her delay is that she trusted, until pursuing a remedy herein, that defendants would look out for her. She claims now that they are not. Whether that is true or not, there is no question that plaintiff consciously chose to opt for whatever she believes defendants would or would not do for her and deliberately determined not to seek relief from the courts. She should not now be heard to complain about the Will or the *inter vivos* transfers after saying nothing for 3 years.

---

[1] We reject the trial court's determination that a delay of three years occurred for two reasons. First, although it described the meeting in the lawyer's office for the reading of Eli's will as having occurred in the fall of 1995, Bruria testified that the meeting occurred in the *late* fall of 1995. Second, although it was in September 1998 that Ilan formally moved to have Bruria become a plaintiff, she had filed her certification supporting Ilan's initial complaint on May 20, 1998. Since both complaints almost exclusively sought relief benefitting Bruria, it would appear that the earlier date more fairly reflects the time at which she acted in a manner that gave defendants notice of her claims. Therefore, rather than a delay of three years, we have a delay of about two and one-half years. However, we do not perceive the difference in time to be significant in resolving this case.

Elsewhere in its opinion, the trial court made these findings, adopting defendants' description of plaintiff's delay:

As defendants accurately summarized plaintiff's delay:

The most important factors here, however, revolve around the fact that Mrs. Mosery was present and acquiesced in her husband's signing of the 1994 will, and in 1995, after his death, she knew that she got zero from his estate. From the fall of 1995 until the fall of 1998, this situation was perfectly acceptable to her. Only after talking with her son Ilan and determining that she had to choose sides between and among her sons did she decide that the way in which the estate had been handled was improper and she wanted it set aside. While she was deciding her course of action over that three year period, the parties changed their positions and restructured the corporations.

On the issue of prejudice to defendants, the trial court made the following determinations:

[T]he court is ... satisfied that defendants would be prejudiced by the continued maintenance of this action.

[T]he original parties to this action, i.e., Ilan Mosery (the original plaintiff), and defendants, were parties to an action which was then pending in the Supreme Court of the State of New York, County of Kings.... That action involved some of the same assets which plaintiff complains about herein. By way of an earlier motion in this court, this action was stayed pending resolution of the remaining aspects pending in the New York action. As this court observed in staying the action on October 2, 1998:

The New York action was settled and discontinued by way of the entry of a Stipulation of Settlement executed by the parties or their representatives and filed with the New York court on or about January 22, 1998. That stipulation dealt with the continued maintenance of the corporate parties and the payment of monies to plaintiff [Ilan Mosery] and the payment of support to Bruria Mosery [plaintiff herein] of $1000 per week. It is apparently the corporations referred to in the New York complaint which form the lion share of what would have been the assets of the Estate but for the inter vivos transfers complained of [originally] by plaintiff Ilan Mosery [and now complained of by plaintiff Bruria Mosery] in the action before this court.

*Opinion and Order of October 2, 1998* at 4. After the entry of a stay in this court, the parties in the New York action negotiated a settlement which included, as a term of the settlement, [n.8] Ilan Mosery's discontinuation of his claims in this court. However, this action has been continued, now in the name of Bruria Mosery.

While plaintiff Bruria Mosery was never a party to the New York action it seems rather clear from her deposition testimony in this court that she was aware of it. Moreover, even though she was never a party to the New York action, plaintiff has clearly benefitted from it, since a product of the original settlement called for the payment to her of $1000 per week. Defendants have certainly altered their positions which existed prior to the commencement of the New York action by

having entered into the stipulation and performed in accordance with it. The outcome which plaintiff seeks in this case would essentially make all that has occurred since 1995, and all that was agreed to by way of the two stipulations of settlement in the New York action, for naught.

[n.8] The New York case had been settled by a stipulation but pending at the time this court stayed this action was a motion by defendants to enforce the settlement. That was resolved by way of the entry of another stipulation which caused the transfer of various interests in the partnerships formerly owned by decedent. That stipulation also reconfirmed the payments to Bruria Mosery.

## III

■ Although we generally defer to findings of fact by a trial court where demeanor is involved, *see, e.g., Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965), that deference is not appropriate since the case was decided on summary judgment. *See, e.g., Prudential Property & Cas. Ins. Co. v. Boylan*, 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div.), *certif. denied*, 154 *N.J.* 608, 713 A.2d 499 (1998). Moreover, it has long been the practice in reviewing chancery decrees for appellate courts "to make an independent investigation of the facts." *Graham v. Onderdonk*, 33 *N.J.* 356, 360, 164 *A.*2d 749 (1960) (citations omitted).

To place our discussion of laches in context, we first take note of the principles governing application of the doctrine of "undue influence" with respect to both wills and *inter vivos* transfers, as expressed by the Supreme Court in a dispute between a father and his son over *inter vivos* transfers that stripped the father of virtually all his assets:

With respect to a will, to create a presumption of undue influence the contestant, by comparison, must show the existence not only of a confidential relationship, but also "suspicious circumstances," however "slight." *Haynes, supra*, 87 *N.J.* at 176, 432 *A.*2d 890. Without proof of suspicious circumstances, a confidential relationship will not give rise to the presumption in the testamentary context. 5 *N.J. Practice, Clapp, Wills & Administration* § 62, at 224–28 (3d ed.1982). Underlying the absence of a requirement of showing suspicious circumstances with an *inter vivos* gift is the belief that a living donor is not likely to give to another something that he or she can still enjoy. *Id.* at § 62, at 226 n. 15.

When the presumption of undue influence arises from an *inter vivos* gift, the donee has the burden of showing by clear and convincing evidence not only that "no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." *In re Dodge, supra*, 50 *N.J.*

at 227, 234 *A.2d* 65 (quoting *In re Fulper's Estate*, 99 *N.J. Eq.* 293, 302, 132 A. 834 (Prerog.Ct.1926)); *accord Slack, supra*, 66 *N.J. Eq.* at 449, 59 *A.* 466; *Mott, supra*, 49 *N.J. Eq.* at 198, 22 *A.* 997. If the donor is dependent on and makes an "improvident gift" to the donee that strips the donor of all or virtually all his assets, a presumption arises that the donor did not understand the consequences of his act. *Vanderbach v. Vollinger*, 1 *N.J.* 481, 489, 64 *A.2d* 225 (1949). In this context, the donee must show that the donor "had the benefit of competent and disinterested counsel." *Seylaz, supra*, 5 N.J. at 173, 74 A.2d 309; *accord Vanderbach, supra*, 1 *N.J.* at 489, 64 *A.2d* 225. A similar rule applies when a physically or mentally weakened donor, without receiving any advice, makes a gift to a donee on whom the donor depends. If that gift leaves the donor without adequate means of support, the presumption of undue influence is conclusive. *Seylaz, supra*, 5 *N.J.* at 173, 74 *A.2d* 309; *Vanderbach, supra*, 1 *N.J.* at 488–89, 64 *A.2d* 225; *In re Fulper's Estate, supra*, 99 *N.J. Eq.* at 302, 132 *A.* 834. When the donor is not dependent on the donee, however, "independent advice is not a prerequisite to the validity of an improvident gift even though the relationship between the parties is one of trust and confidence." *Seylaz, supra*, 5 *N.J.* at 173, 74 *A.2d* 309.

[*Pascale v. Pascale*, 113 *N.J.* 20, 30–31, 549 *A.2d* 782 (1988).]

In considering the application of the doctrine of laches to these circumstances, we are guided by this explanation, appearing in *Lavin v. Hackensack Bd. of Ed.*, 90 *N.J.* 145, 447 *A.2d* 516 (1982):

The length of delay, reasons for delay, and changing conditions of either or both parties during the delay are the most important factors that a court considers and weighs.... The length of the delay alone or in conjunction with the other elements may result in laches.... It is because the central issue is whether it is inequitable to permit the claim to be enforced, that generally the change in conditions or relations of the parties coupled with the passage of time becomes the primary determinant. That is why some courts have stated that the mere lapse of time is insufficient, though, as indicated above, that is an overstatement of the principle. Inequity, more often than not, will turn on whether a party has been misled to his harm by the delay.

[*Id.* at 152–153, 447 *A.2d* 516 (citations and footnote omitted).]

*Lavin*, however, did not involve parties who were in a confidential relationship. Of course, one of the more obvious confidential relationships, the one with which we are concerned, is that of parent and child. *Pascale, supra*, 113 *N.J.* at 34, 549 *A.2d* 782 (citations omitted). In that regard, the Supreme Court has declared that "the defense of laches is not regarded with favor where [as here] the parties stand in a confidential relation." *Weisberg v. Koprowski*, 17 *N.J.* 362, 378, 111 *A.2d* 481 (1955) (citation omitted).

■ Given the limits placed by the trial court on discovery, it was obliged to assume that defendants caused Eli to execute the 1994 will and the subsequent transfers, which stripped him of virtually all assets, by the exercise of undue influence.

Bruria testified that she delayed bringing an action because, as she understood it, Eli's assets were going to be treated by defendants as if they belonged to her. As she described it, Zvi told her immediately after the reading of the 1994 will that there was no reason for her to be upset because "[e]verything is yours. It's only on paper. It's just for the tax purpose. It's just on paper. It's yours." Her testimony in that regard is supported by the affidavit filed by defendants, wherein they state, among other things, that "[p]rior to January 1, 1998, our mother spent [from the transferred assets] whatever amounts of money she wanted to spend in an unlimited fashion...."

Without citing any of that testimony, or Bruria's other statements indicating that both defendants assured her that the assets were, in essence, being held in some form of trust for her, the trial court determined that Bruria was simply relying on defendants "for whatever ... defendants would or would not do for her and deliberately determined not to seek relief from the courts." That conclusion is inconsistent with the evidence, particularly since the trial court stated that it was accepting as true all of Bruria's testimony.

Nor can we accept the trial court's conclusion that laches is appropriate here because of prejudice to defendants. Even putting to one side the principle that "the defense of laches is not regarded with favor where the parties stand in a confidential relation," *Weisberg, supra,* 17 *N.J.* at 378, 111 *A.*2d 481, as they unquestionably do in this case, we perceive no facts clearly establishing prejudice to defendants. Although the trial court found that the defendants had changed their position to their detriment in reliance on their mother's inaction, the facts as set forth in this record do not support those conclusions. The initial stipulation of settlement in the New York action had not brought

that matter to a close before this complaint was filed. The second stipulation of settlement was entered into by defendants long after they had notice of this action, and even that did not resolve the matter. Indeed, as we have noted, defendants' brief states that the New York case is still not settled.

Laches is an affirmative equitable defense, *Auciello v. Stauffer,* 58 *N.J.Super.* 522, 531, 156 *A.*2d 732 (App.Div.1959), and while we do not exclude the possibility that a full trial of this action might demonstrate prejudice, we cannot agree that prejudice was established by this record. Moreover, a trial may reveal evidence that defendants employed undue influence to defraud their parents of their assets. Should that occur, the defense of laches would be inapplicable. *Gallagher v. New England Mut. Life Ins. Co. of Boston,* 19 *N.J.* 14, 23, 114 *A.*2d 857 (1955) (citation omitted) ("In a court of equity, however, the rule of laches is never applied in favor of the perpetrator of a carefully designed and studied scheme of fraud. . . .").

## IV

The parties have discussed at length plaintiff's desire to pursue a claim for an elective share of Eli's estate pursuant to *N.J.S.A.* 3B:8-1 to –19. Plaintiff criticizes the trial court for not dealing with the issue, while defendants contend that this claim was never properly raised in the trial court, and, in the alternative, that if it was, it should have been barred because plaintiff joined in the transfers of stock. *See N.J.S.A.* 3B:8-5.

Although the trial court did not resolve any questions regarding plaintiff's claim for an elective share, it certainly understood that claim as having been made by the pleadings. At the beginning of its opinion, the trial court said, in describing the complaint, that plaintiff "also asserts . . . the right to an elective share of the estate." While the complaint does not expressly ask for relief under the elective share statute, its reference to it, and its repeated requests for "any and all other relief which this [c]ourt deems just and equitable," certainly warranted the trial court's

conclusion. Given the liberal principles designed to sustain a complaint in the face of a motion to dismiss for failure to state a claim, *Printing Mart v. Sharp Electronics*, 116 *N.J.* 739, 746, 563 *A.*2d 31 (1989), we are satisfied that recognition of this claim as an issue in the case is entirely proper.

Since the trial court limited discovery to the issue of laches and made no findings of fact with regard to the elective share claim, as to which there appear to be numerous factual disputes, the question of whether plaintiff was barred from pursuing it by *N.J.S.A.* 3B:8–5 cannot be considered on this record.

## V

We conclude with the following observations. Had we sustained the defense of laches in these circumstances, defendants could totally abandon their mother, leaving her without adequate means of support. To say the least, it is difficult to imagine that result as an accurate reflection of Eli's intent when he transferred his real estate holdings to his sons. Therefore, we are satisfied that viewed fairly, plaintiff's complaint should be understood as also seeking relief under the equitable doctrines of constructive and resulting trusts. *See, e.g., D'Ippolito v. Castoro*, 51 *N.J.* 584, 589, 242 *A.*2d 617 (1968); *Graham, supra*, 33 *N.J.* at 364, 164 *A.*2d 749; and Bogert, *Trusts and Trustees*, c. 23 & 24, §§ 451–69 & 471–501 (Rev.2d Ed.1978). Since these matters have not been briefed, we of course express no opinion on their merits.

Reversed and remanded for further proceedings.