845 A.2d 714 (2004)
368 N.J. Super. 226
In the Matter of the ESTATE OF Brian A. YATES, deceased.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 2004.
Decided April 8, 2004.
*715 Ted M. Rosenberg, Moorestown, argued the cause for appellants Frank and Regina A. Smith.
Tommie Ann Gibney, Haddonfield, argued the cause for respondents Estate of Brian A. Yates, deceased, and Rona Adams, Administratrix (Andres & Berger, attorneys; Ms. Gibney, of counsel and on the brief).
Craig W. Yates, respondent, argued the cause pro se.
Before Judges SKILLMAN, COBURN and C.S. FISHER.
The opinion of the court was delivered by
COBURN, J.A.D.
This appeal concerns a claim for specific performance of a real estate contract, which the Chancery Division denied on the ground that the agreement was insufficient to satisfy the Statute of Frauds.[1] Although we accept the judge's fact-finding, as amplified by facts that were either uncontroverted *716 or acknowledged as true by the parties, we disagree with his resolution of the determinative legal issue, reverse the order denying specific performance, and remand for resolution of the remaining issues.

I
In 1986, Craig W. Yates purchased a single-family house at 32 Minnetonka Trail, Medford Lakes, for $145,000. Although he was the sole source of the purchase money, he took title as "Craig W. Yates, custodian for Brian A. Yates." Brian, who was Craig's son, was born on June 21, 1983. He lived with his mother, Rona Adams. Craig bought the house because he wanted to provide a home for Brian and Rona. He took title in the manner indicated as a matter of tax planning for his estate, although he did not understand the precise legal meaning, if any, of the word "custodian"[2] in this context.
In 1989, after Brian and Rona had lived in the house for less than two years, and after a brief tenancy by others, Craig entered into an oral contract to rent the house to Frank and Regina Smith for $832 a month, with an option to purchase it for $150,000. At that time, Craig, a local bank president and an attorney-at-law, believed the property was worth between $135,000 and $140,000. Smith and Craig also agreed that the Smiths would be responsible for routine maintenance and club dues and Craig would be responsible for real estate taxes and insurance. Because the property was then in a state of disrepair, they further agreed that the Smiths would have the right to perform major renovations of the property. Although no time limit was placed on the option, both sides understood that its exercise would be limited to a reasonable time, and if Craig needed to sell the house and the Smiths were unable or unwilling to purchase, they would be compensated fairly for the value of any renovations they had accomplished.
The Smiths moved in immediately and during the next ten years completed numerous improvements, which included staining the log walls, adding two skylights, replacing kitchen cabinets, adding new ceilings and ceramic tiles, remodeling two bathrooms, enclosing the porch, installing new appliances, replacing a roof, digging a new well, adding a deck and landscaping. Although the judge did not make findings as to value with respect to all of the improvements, he did find that the well cost $4,050 and the supplies and building materials cost about $25,000. The Smiths supplied most of the labor.
In 1994, Frank, who had been a childhood friend of Craig's children, became an employee at Craig's bank. In 1999, the Smiths felt they were ready to purchase the house, and Craig orally agreed to sell it to them at the option price. When the *717 Smiths sought a mortgage commitment, they were told that it could not be provided until they submitted a written contract for purchase of the property. After discussing the matter with Craig, Frank downloaded on his computer a document form which he entitled "Offer to Purchase Real Estate."
On February 1, 1999, the Smiths signed the form, which listed the seller as "Craig W. Yates," described the property by its street address and town, set the purchase price at $150,000, subject to the buyers receiving a mortgage commitment of undetermined amount, called for a closing within thirty days of acceptance by the seller, and required delivery of a warranty deed. It also contained many of the other terms found in customary real estate contracts. The form ended as follows:

ACCEPTANCE OF OFFER
I hereby accept the offer set forth above.
Dated: 2/2/99
S/ Craig W. Yates
Craig W. Yates, SELLER/OFFEREE
After signing, Craig returned the form to the Smiths.
When the Smiths received the mortgage commitment, they were unhappy with some of its terms which resulted in a higher cost for the loan than they had expected. After discussing the problem with Craig, they all agreed that it would be better to allow more time for the closing so that the Smiths could save money to increase their down payment and reduce their carrying charges.
On January 17, 2001, Brian died. The beneficiaries of his estate, in equal shares, are Craig and Rona. In February 2001, the Smiths informed Craig that they were ready to close title on the property. Craig replied that they would have to deal with Brian's estate because of the way in which he had taken title, a fact previously unknown to the Smiths. He also said that the Smiths could stop remitting the rent, which would be adjusted at closing. The judge noted that appraisals received into evidence without objection showed "the property to have a value of $165,000 as of March 5, 2001[,] and $180,000 as of August, 2002."
Rona became the administratrix of Brian's estate. At first, according to Craig, she had indicated a willingness to complete the sale, but not just then, and he so advised the Smiths. When the Smiths later pressed for a closing through their attorney, he received a letter dated October 30, 2001, from Rona's attorney, which read as follows:
Thank you for your letter of October 24, 2001[,] enclosing the March, 2001 Commerce Bank appraisal of the abovereferenced property.
You did not enclose a copy of the mortgage commitment (and appraisal) the Smiths obtained in January, 1999, as requested in my letter of October 3, 2001. Please forward this information as soon as possible.
You state that your clients wish to purchase the property within 30 days, yet you are ignoring my demand, on behalf of the Administrat[rix] of the Estate, for immediate remittance of rent due and owing since January, 2001. The Administrat[rix] certainly will not consider a sale on any terms to tenants who are not current in their rent.
If such payment is not received by close of business November 7, 2001, the Administrat[rix] has instructed me to commence eviction proceedings.
On November 30, 2001, the Smiths filed their complaint for specific performance, and on February 15, 2002, as a result of *718 Rona's eviction demand, they moved out of the house, without, of course, giving up on their claim. Since then the house has remained vacant.

II
First, the trial court determined that the Statute of Frauds provided Brian's estate with a complete defense to specific enforcement of the oral real estate contract, which it considered to be the 1989 agreement. Then it determined that the Statute of Frauds also provided a complete defense against specific performance of the written contract because the proper transferor was not identified therein. Finally, it held that even if the written contract was valid, the Smiths could not enforce it because of their failure to secure a mortgage and close within thirty days.
We begin our analysis by considering the legal effect of Craig taking title "as custodian" for his son. When a parent takes title to real estate in the name of his or her child, using personal funds for the purchase, a gift is presumed. Weisberg v. Koprowski, 17 N.J. 362, 372, 111 A.2d 481 (1955). However, even then "the question of gift or trust is a matter of intention and the court's quest is to discover the payor's intention as revealed by all the circumstances." Id. at 374, 111 A.2d 481.
Since Craig did not take title in his son's name but as custodian, the natural inference is that he intended to create some sort of trust. Since, as he testified, he followed this course as part of planning for his own estate, by which we take him to mean that he intended to avoid taxation of his estate to the extent possible, it is also clear that he wanted to create an irrevocable trust. Coffey v. Coffey, 286 N.J.Super. 42, 55 n. *, 668 A.2d 76 (App.Div.1995), certif. denied, 144 N.J. 172, 675 A.2d 1121 (1996). At the time, Brian was only three years old. From that fact, and the corroborative subsequent events, we infer that Craig did not intend that this trust would always consist of the real property itself. In other words, we infer that he intended to retain as trustee the power to sell the property and otherwise invest the proceeds for his son.
If Craig were now resisting enforcement of the arrangement he created on the ground that no trust existed because he had not properly segregated the trust assets from his own property, id. at 52, 668 A.2d 76, or because "when real estate is involved, the trust must be in writing[,]" In re Declaration of Trust by Rose Catanio, 306 N.J.Super. 439, 445, 703 A.2d 988 (App.Div.1997), a court might be justified in holding that no trust existed. But that is not his position. Since Craig acknowledges the trust but asserts that in creating it he did not intend to restrict his power of sale, we see no justification for our doing so.
When a trustee is empowered to enter into a contract for the sale of real estate, the contract may be specifically enforced:
Where the trustee makes a contract to sell, lease, mortgage or otherwise dispose of or deal with trust property in the proper exercise of a power to make such a contract, the other party to the contract can specifically enforce the contract, provided that it is one which would be specifically enforceable against the trustee if he held the property free of trust.
[Restatement (Second) of Trusts § 272(1) (1959).]
Professor Williston put it this way:
The administration of an active trust frequently calls for the making of contracts and expenditures by a trustee. It may be said that generally, a trustee has the power and duty to make contracts *719 and expenditures requisite to the administration of the trust. However, the historical and prevalent rule is that a trustee has no representative power, in the absence of authorization by statute or by the trust instrument or declaration, to contract as an agent may do for his principal and directly bind the trust estate or the cestui que trust....
....
Those who have contracted with the trustee have ordinarily no right to a remedy against the cestui que trust, or the trust estate. An exception to this rule exists in the case of a contract which relates to land or other unique property belonging to the trust; equity will specifically enforce such a contract, if the trustee was authorized to make it, by compelling the trustee to convey.
[12 Williston on Contracts § 35:78 (Lord ed.1999)(footnotes omitted).]
Therefore, we are satisfied that Craig was entitled to sell the property on behalf of his son, and that his son's estate is bound by the 1999 oral contract of sale, which was based on the 1989 option agreement.
When parties contract for the sale of real estate, an equitable conversion occurs. Courtney v. Hanson, 3 N.J. 571, 575, 71 A.2d 192 (1950). The purchaser becomes the "equitable owner," and the seller becomes "entitled in equity to the purchase price...." Ibid. Assuming the enforceability of the oral agreement made in 1999, the Smiths became the equitable owners of the subject property and would have been entitled in a specific performance action to receive a deed from Craig.
Arguably Craig would not have been permitted to raise the Statute of Frauds as a defense to such an action because of the Smiths' restoration of the premises in reliance on Craig's agreement, but we need not decide that point. For when one admits the parol agreement without offering a defense based on the Statute of Frauds the benefit of the statute is waived. Barnes v. P. & D. Mfg. Co., 117 N.J.L. 156, 160-162, 187 A. 186 (E. & A.1936); Dean v. Dean, 9 N.J. Eq. 425, 427 (Ch.1853).
Since the Smiths were entitled to a deed from Craig, which still may be required by a prudent title company, the unfortunate but fortuitous death of Brian should not interfere with their right. In the circumstances of this case, the estate had no right to defend against the oral contract on the basis of the Statute of Frauds.
Nor does the Statute of Frauds provide a defense to the written agreement. When the written agreement was executed in 1999, the Statute of Frauds provided, in pertinent part, that an agreement to transfer any interest in real estate is unenforceable unless
a description of the real estate sufficient to identify it, the nature of interest to be transferred, the existence of the agreement, and the identity of the transferor and transferee are established in a writing signed by or on behalf of the party against whom enforcement is sought....
[N.J.S.A. 25:1-13a (emphasis added).]
We disagree with the trial court's conclusion that this agreement failed to identify the transferor because it did not show that Craig was acting in a representative or trust capacity. Craig held legal title to the property when the contract was made and signed the agreement as transferor. He could not have raised the Statute of Frauds as a defense to this written contract prior to his son's death, and we see no equitable reason for permitting his son's estate to do so now. As we *720 observed in Graziano v. Grant, 326 N.J.Super. 328, 341, 741 A.2d 156 (App. Div.1999), "[t]he Statute of Frauds cannot be invoked to work an injustice." And that would certainly be the result if the Smiths, who devoted so much of their time and money to improve this property, were denied the right to its title, while the estate, which did nothing, received the benefits of their labor.
We also disagree with the trial court's ruling that the Smiths breached the written agreement by failing to close within the thirty days called for by the contract. Oral agreements which do no more than extend the time for performance of contracts which otherwise satisfy the Statute of Frauds are valid unless the contract has made time of the essence. Tiedemann v. Cozine, 297 N.J.Super. 579, 582, 688 A.2d 1056 (App.Div.1997); Schlecter v. Hollander, 11 N.J.Super. 236, 240-41, 78 A.2d 279 (App.Div.1951). Thus, the oral agreement between the Smiths and Craig putting off the closing was legally binding. Since they did not agree on a specific time, the law infers that the contract will be performed within a reasonable time. Mazzeo v. Kartman, 234 N.J.Super. 223, 231, 560 A.2d 733 (App.Div.1989).
"What constitutes a `reasonable time' is usually an implication of fact, and not of law, derivable from the language used by the parties considered in the context of the subject matter and the attendant circumstances, in aid of the apparent intention." Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9, 28, 138 A.2d 402 (1958). Given the unusual circumstances of this case and the relationship of the parties to the contract, we are satisfied that the two-year extension was reasonable. Therefore, the delay will not prevent enforcement of the contract. Forrest v. Forrest, 241 N.J.Super. 239, 243, 574 A.2d 1004 (App.Div.1990).
In light of our disposition of this case, we touch on one further point. In February 2001, the Smiths agreed with Craig that they could stop remitting the rent until the closing, at which time it would be paid as an adjustment. Since they moved out, at the estate's insistence, on February 15, 2002, there should be an appropriate adjustment for the rent accruing until that time.
Reversed and remanded for entry of a judgment for specific performance in favor the Smiths, subject to their payment at closing of the rent.
NOTES
[1] Although other issues were pled, the trial judge directed that they be tried subsequently. Instead of resolving them, he directed entry of final judgment on the specific performance claim. See R. 4:42-2 and R. 4:59. In our view, those rules were inapplicable because the parties seeking specific performance were seeking, as alternative relief, damages for improvements they had made to the property. Having decided that they were not entitled to specific performance, the judge was obliged to at least adjudicate the alternative claims to achieve the required "complete adjudication of [the] separate claim...." R. 4:42-2(1). However, rather than dismiss this appeal as interlocutory, we grant leave to appeal nunc pro tunc. R. 2:4-4(b)(2).
[2] At the time Craig took title in 1986, the statutory scheme in effect was the New Jersey Uniform Gifts to Minors Act ("NJUGMA"), L. 1963, c. 177, codified at N.J.S.A. 46:38-13 to -41. However, as that statute expressly limited its definition of "custodial property" to include only certain types of personal property, N.J.S.A. 46:38-14(e), the NJUGMA was not applicable to this transaction. Effective July 1, 1987, after Craig had taken title to the property, the Legislature adopted the New Jersey Uniform Transfers to Minors Act ("NJUTMA"), L. 1987, c. 18, § 1, codified at N.J.S.A. 46:38A-1 to -57. Although the NJUTMA does by its terms apply to transfers of real estate, N.J.S.A. 46:38A-2d, it cannot be applied to this particular transfer as our Legislature declined to adopt the provision of the Uniform Law allowing retroactivity. See Uniform Transfers to Minors Act § 22, 8C U.L.A. at 81, Action in Adopting Jurisdictions (2001). As of its effective date, however, before using the word "custodian" in documents created in this context, reference to the NJUTMA would be appropriate.