854 A.2d 928

GUNTHER JOCK, SHERRY OBERG, SANDRA BARRE AND GEORGE SOLLAMI, PLAINTIFFS–APPELLANTS, v. ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF WALL, PAUL AMATO, JOYCE AMATO AND SHIRE REALTY, INC., DEFENDANTS–RESPONDENTS, AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WALL, AND TOWNSHIP OF WALL, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued April 27, 2004—Decided August 2, 2004.

Before Judges SKILLMAN, COBURN and C.S. FISHER.

*Walter R. Bliss, Jr.* argued the cause for appellants.

*Thomas J. Hirsch* argued the cause for respondent, Zoning Board of Adjustment of the Township of Wall.

*Timothy B. Middleton* argued the cause for respondents, Paul Amato, Joyce Amato and Shire Realty, Inc.

The opinion of the court was delivered by

FISHER, J.A.D.

The judgment under review dismissed a complaint in lieu of prerogative writs, thereby rejecting plaintiffs' claim that the board of adjustment erroneously failed to find that two contiguous lots had merged. Plaintiffs contend that merger occurred because equitable or constructive ownership of the two lots were held by the same persons even though legal title was deliberately kept separate. According to plaintiffs, this merger should have required the board of adjustment to conclude that the hardship asserted by defendant Shire Realty, Inc., a later title holder of one of the contiguous lots, was self-created. We agree and reverse.

The Supreme Court, in *Loechner v. Campoli,* 49 *N.J.* 504, 509, 231 *A.*2d 553 (1967), determined that ownership of contiguous lots as delineated on a map filed under the Old Map Act, *L.* 1898, *c.* 232, did not irrevocably vest landowners "with a right in those lots which prevents the exercise of the police power to limit the use of such lots through dimension or area guides." The Court rejected the argument that "individual lots never lose their separate identities regardless of how many contiguous lots remain in or are reassembled into one ownership," and held that undersized, contiguous lots, owned by the same person, would be deemed "merged." [1] *Id.* at 509–10, 231 *A.*2d 553. In this case, we are

---

[1] While the merger doctrine has exceptions, *see Chirichello v. Zoning Bd. of Adjust., Bor. of Monmouth Beach,* 78 *N.J.* 544, 397 *A.*2d 646 (1979) (merger does not necessarily occur where back-to-back lots front different streets); *Pribish v. Corbett,* 105 *N.J.Super.* 407, 252 *A.*2d 731 (App.Div.1969) (lots created pursuant to a lawful subdivision will not merge even if they become non-conforming); *but see Bridge v. Neptune Tp. Zoning Bd. of Adjust.,* 233 *N.J.Super.* 587, 559 *A.*2d 855 (App.Div.1989) (distinguished *Chirichello* and held that back-to-back nonconforming lots would be deemed merged if a structure was built which overlapped both lots), we also broadened its application in *Dalton v. Ocean Tp. Zoning Bd. of Adjust.,* 245 *N.J.Super.* 453, 461, 586 *A.*2d 262 (App.Div.), *certif. denied,* 126 *N.J.*

required to determine whether two lots merged or, stated differently, whether the hardship claimed by defendant Shire Realty, Inc. in seeking variances to develop a vacant, non-conforming lot was self-created either by the actions of its principal, defendant Paul Amato, or by the actions of preceding owners.[2]

The issue presented requires our examination of the extent of possession or control over the adjacent lots necessary to constitute joint ownership for merger purposes. Defendants contend that the simultaneous ownership of *legal title* of the contiguous lots is the critical quality, while plaintiffs claim *equitable or constructive ownership* of adjacent non-conforming lots is sufficient to create a merger. We reject defendants' exaltation of legal title and conclude that the circumstances surrounding ownership of these lots at two different points in time caused the lots to merge or, stated another way, the efforts to avoid merger rendered the isolation of the non-conforming lot a self-created hardship.

The matter at hand concerns two adjacent lots—Lots 26 and 27—in Wall Township.[3] While the parties dispute the meaning or significance of much of the evidence, an examination of the record reveals no genuine factual dispute. Lots 26 and 27 were originally part of an eighty-five acre tract; their designation as separate lots

---

324, 598 A.2d 884 (1991), by holding that the doctrine applies not only when two contiguous, non-conforming lots form a conforming lot but also when the resulting parcel is nonconforming so long as it "more nearly meets current zoning standards."

[2] Whether the lots had previously merged was raised, but not decided, in an earlier appeal. On that occasion, we held that Amato's appearance before the board of adjustment as an expert witness regarding Shire's application for a hardship variance, when Amato was also a member of the board, although not participating as a board member on Shire's application, created a potential for conflict and required the vacating of the board's resolution. *Jock v. Shire Realty, Inc.*, 295 *N.J.Super.* 67, 684 A.2d 921 (App.Div.1996).

[3] Plaintiffs Gunther Jock and Sherry Oberg own lot 28, plaintiffs Sandra Barre and George Sollami own lot 26, having purchased it from defendant Paul Amato, and Shire Realty holds title to Lot 27.

occurred during the reign of the Old Map Act. In 1939, the sole owner of both lots separately conveyed them to others.

While the lots may have once conformed to existing zoning requirements, they became non-conforming when a 1955 zoning ordinance placed the lots in a zone requiring minimum lot area of one acre and minimum lot width of 200 feet. Lot 26 was already developed, but Lot 27, then owned by Donald and Nancy Sherman, remained vacant. In 1977, the 1955 ordinance was amended, this time placing the property in a zone requiring a minimum lot area of 30,000 square feet.

J. Clarence Allen and Ethel M. Allen purchased Lot 26 in 1957. In 1960, they purchased from the Shermans Lot 27, which adjoined Lot 26 on the east, as well as a twenty-foot strip of Lot 25, which adjoined Lot 26 on the west. The sale of the twenty-foot strip of Lot 25 was preceded by the planning board's approval of its subdivision from Lot 25 and its designation as Lot 26B. The Allens' acquisition of Lot 26B did not, when joined with Lot 26, create a conforming lot. If merged, Lots 26 and 27 would have constituted a conforming lot.

While the Allens supplied the $8,000 purchase price, and Clarence Allen alone negotiated the transaction, the Shermans were directed by the Allens to convey title to their son, Robert. Clarence Allen testified at his deposition that the deeding of Lot 27 to Robert constituted a "gift." Notwithstanding where title was placed, the unrefuted evidence before the board of adjustment demonstrated the complete dominion over Lot 27 thereafter exercised by Clarence and Ethel Allen. This is best demonstrated by the fact that, in 1974, Clarence asked Robert, who readily complied, to give his brother Raymond one-half interest in Lot 27, thus contradicting the claim that fourteen years earlier the property had been irrevocably gifted to Robert.

In fact, the evidence revealed that during the thirty-two years that followed its purchase, Clarence and Ethel exercised complete physical dominion and control over Lot 27 despite the fact that legal title was held by Robert and, later, jointly by Robert and

Raymond. For example, Clarence applied for a permit in his own name to build a "tool house" on Lot 27; Clarence testified that this structure was built for his own purposes, and he painted it in the same color scheme as the Allens' home on Lot 26, from which the tool house also received its electrical power. Clarence also installed a flagstone path connecting the tool house with the Allen home on lot 26, and dug a well on Lot 27, for use in watering the lawn on both lots, all at his own expense, and without seeking or obtaining his son's permission.

The Allens' complete dominion over Lot 27, and their deliberate disregard of its boundary line with Lot 26, was further demonstrated by the fact that, in 1964, Clarence authorized installation of a waterline which ran across Lot 27 to the house on Lot 26, where it still remains. Clarence also built a common fence around both Lots 26 and 27 to give his dog "the whole lot to run in, the two lots." Clarence installed, at his own expense, bulkheading and a dock along the riverside of both lots, and kept his cabin cruiser moored to the dock, thus straddling the common riparian boundary of both Lots 26 and 27. The Allens also planted a forty square foot vegetable garden on Lot 27. The tax bills for both Lots 26 and 27 were sent to, and paid by, Clarence and Ethel Allen.

In 1989, desirous of selling both lots, Clarence and Ethel entered into listing agreements with a realtor, indicating they were owners not only of Lot 26 but also of Lot 27. And, while they may have discussed the sale of the property with their sons, Clarence testified he did not need their permission to list Lot 27 for sale, or to accept or reject an offer.

Based upon these facts, plaintiffs claim Lots 26 and 27 merged because, even though the Allens kept legal title to the two lots in different names, they nevertheless held themselves out as the owner of both lots, exercised complete dominion and control over the lots, and ignored their boundary line. In response to that argument, defendants rely upon the findings of fact of the board of adjustment and the trial judge.

■ We observe that all the information before both the board of adjustment and the trial judge regarding the Sherman–Allen transaction in 1960, and the use to which Lot 27 was put until it was sold to defendant Paul Amato in 1992, was contained in documents moved into evidence and the deposition testimony of Clarence Allen and his two sons. Accordingly, because they had no opportunity to see these witnesses testify or assess their credibility, we need not give any special deference to the findings of either the board of adjustment or the trial judge. See, e.g., Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587, 538 A.2d 794 (1988). We find no support in the record for the board's finding that Robert and Raymond "exercised control and dominion over [L]ot 27" and that "Raymond Allen testified at his deposition that he and his brother controlled decisions concerning their lot." Instead, the Allens' deposition testimony, which we have already outlined in this opinion, permits only one conclusion—that while Robert and Raymond may have held legal title to Lot 27, possession, control and dominion were exclusively held by Clarence and Ethel.

■ Plaintiffs also claim that merger occurred as a result of Paul Amato's agreement to purchase both Lots 26 and 27 from the Allens in 1991. We agree. After some negotiations with Clarence, Paul Amato agreed to purchase both lots for $500,000 without contingencies. Contracts were prepared, indicating that Clarence and Ethel would sell Lot 26 for $400,000, and Robert and Raymond, and their wives, would sell Lot 27 for $100,000. Paul Amato was identified as the purchaser in both contracts. The contracts gave him "the right to assign this contract or take title in the name of some other entity in which he has a controlling interest," although such an assignment or identification of another entity to take legal title would be subject to Paul Amato "continu[ing] to remain responsible for the obligations set forth in this agreement" and that he would "personally execute the note and mortgage" that would secure the payment of part of the purchase price on both lots. More importantly, as contract purchaser, Paul

Amato was the equitable owner of both lots simultaneously. And although, at closing, Paul Amato took title to Lot 26 while Shire Realty took title to Lot 27, Paul Amato continued to control the disposition of Lot 27 as a principal shareholder in Shire Realty.

In determining whether the merger doctrine required a finding by the board of adjustment that merger occurred either when Clarence and Ethel Allen exercised complete dominion over Lot 27 between 1960 and 1992, or when Paul Amato entered into contracts to purchase both lots in 1992, we initially observe that *Loechner* does not hold, as defendants argue, that merger is caused only by the joinder of *legal title*. Instead, *Loechner* spoke only of "ownership" of more than one adjoining lots as the quality which would cause merger. 49 *N.J.* at 507, 512, 231 *A.*2d 553.

■ Not surprisingly, "owner" is broadly defined as the person "in whom is vested the ownership, dominion, or title of property," that is, the person "who has dominion of a thing, real or personal, corporeal or incorporeal, which he has a right to enjoy and do with as he pleases. . . ." *Black's Law Dictionary* (4th ed., 1968). While the relationships of Clarence and Ethel Allen, and later Paul Amato, to Lot 27 comfortably fit this definition, it is more appropriate to conclude that the word is *nomen generalissimum*, obtaining its meaning only from the context in which it is found. *See Hope v. Cavallo*, 163 *Conn.* 576, 316 *A.*2d 407, 409 (1972); 63C *Am.Jur.*2d, *Property* § 26. Thus, while there may be times in which ownership is equated with the possession of legal title, the word has also been utilized to describe a person who has dominion or control over property even though title resides elsewhere. *See, e.g., Robinson v. State*, 7 *Ala.App.* 172, 62 *So.* 303, 306 (1913); *Hope, supra*, 316 *A.*2d at 409; *People v. Chicago Title & Trust Co.*, 75 *Ill.*2d 479, 27 *Ill.Dec.* 476, 389 *N.E.*2d 540, 544 (1979); *Judd v. Landin*, 211 *Minn.* 465, 1 *N.W.*2d 861, 865 (1942); *Guild v. Prentis*, 83 *Vt.* 212, 74 *A.* 1115, 1116 (1910). In short, "own," "owner," and "ownership" have been used both colloquially and in the law to designate a great variety of interests in property. At times, these words may be used "to convey a broad meaning" or

may be used "in a restricted sense," *Petition of Brandt*, 241 *Minn.* 180, 62 *N.W.2d* 816, 820 (1954),[4] their proper scope ultimately depending upon their context and the intended purpose to be accomplished, *Glover v. United States*, 164 *U.S.* 294, 297, 17 *S.Ct.* 95, 96–97, 41 *L.Ed.* 440 (1896). We, thus, conclude that defendants' argument that only the holder of legal title can be an "owner" of property finds no support either in our jurisprudence or in everyday conversation.

Those attributes of ownership which will cause a merger must, therefore, be ascertained through a consideration of the purpose of the merger doctrine. This purpose is best illuminated by *Loechner* which held that the doctrine is based upon the public interest in allowing municipalities, for the good of the entire community, to "enact comprehensive regulatory standards which would facilitate sound and orderly future municipal growth along preconceived lines, in short a planned community growth." *Loechner, supra,* 49 *N.J.* at 510, 231 *A.2d* 553. While the Old Map Act had, in part, the intention of providing "a method for officially filing maps so that future conveyancing instruments might refer to a parcel of realty by reference to the lot numbers as delineated on the map," *Lake Intervale Homes, Inc. v. Parsippany–Troy Hills,* 28 *N.J.* 423, 433, 147 *A.2d* 28 (1958), modern legislation pursued a more ideal relationship between the zoning requirements and the subdivision of land into lots, causing the Court in *Ardolino v. Bor. of Florham Pk., Bd. of Adjust.,* 24 *N.J.* 94, 103, 130 *A.2d* 847 (1957) to conclude that "the mere delineation of lots on a map filed after approval by a municipality carries with it no guaranty that each lot or parcel will be sufficient in itself to be built upon when the time comes to do so." We have recognized, for example, that "our case law [contains] no exception to the self-imposed hardship

---

4 The word "owner" has been defined by our courts both broadly and narrowly depending upon the context. *See, e.g., Mascola v. Mascola,* 168 *N.J.Super.* 122, 128, 401 *A.2d* 1114 (App.Div.1979) (owner for purposes of "dog bite" statute does not include a temporary keeper); *State v. Soto,* 119 *N.J.Super.* 186, 188, 290 *A.2d* 739 (App.Div.1972) (the "owner" of a "place" where an unlawful lottery was conducted includes a tenant).

rule based upon passage of time or transfer of title," being guided, in that regard, by the understanding that "to allow a variance based on such variables would encourage landowners to violate the law and subvert the integrity of the zoning scheme." *Ketcherick v. Bor. of Mountain Lakes,* 256 *N.J.Super.* 647, 655, 607 *A.*2d 1039 (App.Div.1992). *See also Branagan v. Schettino,* 100 *N.J.Super.* 580, 588, 242 *A.*2d 853 (App.Div.1968).

A view of "ownership" as necessarily encompassing legal title as the *sine qua non* in this setting will, at times, frustrate the overarching purpose of preserving the integrity of a zoning scheme. The ease with which ownership of legal title may be manipulated permits the equally easy avoidance of merger, creating, as we described in *Branagan,* the unwanted circumstance of serving only a private economic interest "at the expense of the public interest in the maintenance of the integrity of the zoning plan." 100 *N.J.Super.* at 588, 242 *A.*2d 853. Accordingly, we do not view the joinder of legal title in the same person as the sole dispositive factor in determining whether merger has occurred.

An example demonstrating that ownership, such as will cause a merger, need not always include possession of legal title can be found in *Herman v. Bd. of Adjust., Parsippany–Troy Hills Tp.,* 29 *N.J.Super.* 164, 102 *A.*2d 73 (App.Div.1953). There, we affirmed a trial court judgment that found a board of adjustment's denial of a hardship variance to be reasonable. The non-conforming lot in question was Lot 13, having a frontage of 51.66 feet. Reid Development Corporation was the successful bidder of 332 lots, which included Lot 13, at a mortgage foreclosure sale in November 1949. An amendment to the zoning ordinance which prohibited the construction of a residence on a lot with frontage and area such as Lot 13 was introduced around the same time Reid Development Corporation received a deed for the 332 lots. The municipality's resolution, however, was not adopted until October 3, 1950. After the ordinance's introduction but before its adoption, Reid Development Corporation conveyed 90 of the vacant lots, including Lot 13, to the wife of the corporation's attorney;

the attorney was also an officer and owner of "close to 50 percent" of Reid Development Corporation's capital stock. *Id.* at 168, 102 *A.2d* 73. The deed to the attorney's wife purported to convey "a conspicuously inordinate number of the 90 lots, of which each lot of a frontage of 51 feet is interwoven alternately on the map between a lot owned by the Reid Development Corporation." 29 *N.J.Super.* at 168–69, 102 *A.2d* 73.

Subsequently, the attorney's wife applied to the board of adjustment for a variance, claiming hardship. The trial judge found the board's rejection of the application to be reasonable, and we affirmed. As Judge Jayne explained:

> [T]he isolation of the lot, like so many others in the conveyance, was adroitly purposeful in an anticipated effort to avoid the restrictions of the expected ordinance and that accordingly the voluntary and premeditated isolation was neither an exceptional nor an undue hardship to the plaintiff within the import and meaning of the statute defining the power of the boards of adjustment in the allowance of variances.
>
> Additionally, it was doubtless foreseen that the allowance of variances to the plaintiff to be attached to upward of 90 lots for the same cause would substantially maim, if not effectively devitalize, the observance of the zoning scheme throughout the territory of this development....
>
> [*Id.* at 171, 102 *A.2d* 73.]

As a result, in *Herman,* we disregarded the separate ownership of legal title and viewed the property as if the transfer of title had never occurred.

While there may be distinguishing features between the present circumstances and *Herman,* the manner in which Clarence and Ethel Allen, who purchased Lot 27, but deliberately parked legal title with their son, is not materially different from the transparent manner in which Reid Development Corporation attempted to create hardship by conveying legal title to alternating lots to its attorney/shareholder's wife. *See also Branagan, supra,* 100 *N.J.Super.* at 587–88, 242 *A.2d* 853.[5] Both the Allens and Reid

---

[5] In *Branagan,* the applicant for a variance attempted to create a hardship by deeding legal title to one of three commonly owned lots to an uncle. We held that the board of adjustment abused its discretionary power to issue a variance

Development Corporation had the opportunity to avoid the hardship of the nonconforming condition of their property and both chose to "adroitly" maneuver around the merger doctrine by avoiding (in the Allens' case) or transferring (in Reid Development's case) possession of legal title, while still maintaining complete dominion and control over both the property itself as well as the straw-man to whom legal title was conveyed.

Even defendants would not dispute that if the Allens had taken title to Lot 27 in their own names, Lots 26 and 27 would be deemed to have merged. *Chirichello* requires merger in that circumstance, explaining that "if the owner of a 50–foot front lot had purchased the adjoining 50–foot lot so that the entire piece was conforming, then the owner would be in the same position as if he had always owned the land with a 100–foot frontage[,][and] absent unusual circumstances [it would be said] that for the purpose of the zoning ordinance there had been a merger and that a later sale of a part of the tract which caused nonconformity would result in a hardship of his own doing." 78 *N.J.* at 553, 397 *A.*2d 646. The only difference between the circumstance referred to in *Chirichello* and the Allens' purchase of Lot 27 was the deeding of Lot 27 in the name of their son. And the only difference between the circumstance referred to in *Chirichello* and Amato's contract to purchase both Lots 26 and 27 is that Amato eventually took title to one lot in his name and the other in the name of a corporation he controlled. We reject the contention that erecting an artifice, whether in good or bad faith, whereby legal title is assigned to a straw-man, should become a legally-endorsed exception to the merger doctrine. Owners of contiguous non-conforming lots should not be permitted to accomplish indirectly what the merger doctrine would not permit them to do directly.

---

because the applicant's "voluntary severance of common title . was to subserve a purely private economic interest at the expense of the public interest in the maintenance of the integrity of the zoning plan." *Id.* at 588, 242 *A.*2d 853.

Our conclusion is, in the final analysis, compelled by the fact that the use of land is "subordinate to a valid exercise by a municipality of its power to zone and control land use within its boundaries," *Ardolino, supra,* 24 *N.J.* at 103, 130 *A.*2d 847, the "correlative restrictions" of which "are incidents of the social order, deemed a negligible loss compared with the resultant advantages to the community as a whole, if not, indeed, fully recompensed by the common benefits," *Collins v. Bd. of Adjust. of Margate City,* 3 *N.J.* 200, 206, 69 *A.*2d 708 (1949). We reject defendants' contention that legal title is the sole dispositive factor and conclude that the joint physical possession, dominion and control of contiguous non-conforming lots, including the ability to control, either directly or indirectly, the holder of legal title, more accurately defines the type of ownership which will trigger a merger.

As the facts outlined earlier demonstrate, Lots 26 and 27 merged when Clarence and Ethel Allen purchased Lot 27. The fact that they lodged legal title in Lot 27 with their son was irrelevant, considering that they exercised control and dominion over Lot 27 for over thirty years. Alternatively, Lot 27 must be deemed to have merged with Lot 26 when Paul Amato became the contract purchaser of both lots, since he then became the equitable owner of both lots, *see Courtney v. Hanson,* 3 *N.J.* 571, 575, 71 *A.*2d 192 (1950); *In re Estate of Yates,* 368 *N.J.Super.* 226, 235, 845 *A.*2d 714 (App.Div.2004), even though legal title to Lot 27 was ultimately conveyed by the Allens to Shire Realty. Because Amato, like the Allens before him, had the ability to merge legal title, and maintained control of both the entity holding legal title and the property itself, the lots should have been deemed merged and any later claim that the non-conforming qualities of the lot caused a hardship should have been viewed as self-created.[6] *See*

---

[6] The sale of Lots 26 and 27 by the Allens to Amato did not free Lot 27 of the consequences of the Allens' actions. As we said in *Dalton,* "if a prior owner created the hardship, and would therefore not be entitled to a variance, the impediment is not removed by a purchase by a buyer who did not participate in

*Planning Bd. of Norwell v. Serena,* 27 *Mass.App.Ct.* 689, 542 *N.E.*2d 314 (1989), *aff'd,* 406 *Mass.* 1008, 550 *N.E.*2d 1390 (1990); *Robillard v. Town of Hudson Zoning Bd. of Adjust.,* 120 *N.H.* 477, 416 *A.*2d 1379 (1980); *Wiggin v. Kern,* 161 *A.D.*2d 716, 555 *N.Y.S.*2d 858 (1990); *Stenzler v. Commerdinger,* 50 *Misc.*2d 235, 269 *N.Y.S.*2d 865 (Sup.Ct.1966).

Defendants have also argued that plaintiffs Barre and Salami, the current owners of Lot 26, should be estopped from claiming that Lots 26 and 27 merged or that their present condition constitutes a self-created hardship, because they have allegedly profited from the very thing they now seek to condemn. Even if we were to agree, such an estoppel would not preclude the consideration of these issues since plaintiffs Jock and Oberg, as owners of Lot 28, are not in the same position as Barre and Salami. We also reject the other insubstantial claims defendants urge in support of their estoppel theory.[7] Since both the board of adjustment and the trial judge mistakenly concluded that the separate ownership of legal title precluded a merger, we also need not consider plaintiffs' other arguments for reversal.

We reverse and remand for the entry of a judgment in favor of plaintiffs.

---

creating the problem." 245 *N.J.Super.* at 463–64, 586 *A.*2d 262. *See also Nash v. Bd. of Adjust., Morris Tp.,* 96 *N.J.* 97, 109, 474 *A.*2d 241 (1984); *Ketcherick, supra,* 256 *N.J.Super.* at 655, 607 *A.*2d 1039.

[7] For instance, defendant Amato refers to the fact that a land use official in Wall Township provided him with an opinion that Lots 26 and 27 had not merged through any actions taken by the Allens. Amato relies on *Scardigli v. Bor. of Haddonfield,* 300 *N.J.Super.* 314, 319–20, 692 *A.*2d 1012 (App.Div.1997) where it was held that a municipality or its agencies "may be estopped if the circumstances involve reliance on a good faith act of an administrative official, within the ambit of that official duty, which constitutes an erroneous and debatable interpretation of an ordinance." The application of this holding to the present circumstances would be inequitable since it would have the effect of precluding neighboring property owners even though they had no notice or opportunity to be heard when the erroneous opinion was rendered.