957 A.2d 707 (2008)
403 N.J. Super. 125
Fiona BAYNE, Plaintiff-Respondent/Cross-Appellant,
v.
Earl JOHNSON, Defendant-Appellant/Cross-Respondent, and
Carolyn Johnson, Defendant.
Docket No. A-0974-06T1.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 2007.
Decided October 27, 2008.
*708 Gail J. Mitchell, Union, argued the cause for appellant/cross-respondent (Schwartz, Barkin & Mitchell, attorneys; Ms. Mitchell, of counsel and on the brief).
Michael F. Martino, Livingston, argued the cause for respondent/cross-appellant (Stein, McGuire, Pantages & Gigl, attorneys; *709 Mr. Martino, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ, COLLESTER and C.L. MINIMAN.
The opinion of the court was delivered by
COLLESTER, J.A.D.
Defendant Earl Johnson appeals from a judgment entered in the Family Part in favor of plaintiff Fiona Bayne for $384,000 in damages as palimony and from a separate award of $48,660 against both Earl and his wife, defendant Carolyn Johnson, representing a fifteen percent interest in real property located in North Bergen. Carolyn initially appealed the second portion of the judgment, but that appeal was dismissed at her request. Fiona has cross-appealed from that portion of the judgment denying her counsel fees.
The facts are unique. Carolyn, born on September 16, 1916, is the income beneficiary of a spendthrift trust established by her grandfather which pays her $200,000 to $300,000 per year until her death, when the corpus of about $11 million will devolve to her issue. Carolyn married several times and has three children from whom she is estranged. In 1971 she was involved in a serious automobile accident which left her partially paralyzed. After brain surgery to remove an embolism, she suffered the loss of short-term memory and stroke-like symptoms including a tendency to fall. Age has further compromised her health. She requires full-time caregivers to assist her with the daily necessities of life.
Earl is twenty years younger than Carolyn. He grew up in southern California, attended junior college, obtained an on-line degree, worked as a police officer, and then transitioned into cosmetology. In 1975 he operated a beauty salon and health spa called EDJ's on Wilshire Boulevard in Beverley Hills. It was there that he met Carolyn in 1976. She took an interest in the business, and within a few months she became an investor. Soon after Earl and Carolyn expanded the business by opening similar facilities in Las Vegas hotels.
Carolyn confided to Earl that her son, an attorney, had a plan to petition a court to declare Carolyn incompetent and administer her trust income. After discussing this issue with an accountant, Earl and Carolyn decided that one way to thwart the son's plan was to marry so that Earl would be the next of kin and Carolyn could continue to use the income as she saw fit. It was understood that their relationship was platonic, that they would live together only as friends, and each would be free to conduct their own personal lives. They were married in Los Angeles on May 12, 1978. It was Earl's third marriage and Carolyn's seventh. Earl was forty-one and Carolyn, sixty-one. They moved into an apartment in Beverly Hills, but Earl spent considerable time at Carolyn's Las Vegas condominium to oversee their salons in several hotels.
In 1979 a transfer of ownership of the hotels forced Earl and Carolyn to close their Las Vegas salons, and they sold the one in Beverly Hills. They next went on a cruise where Earl met a man who gave him the idea of starting a business involving metallurgy processing. So in 1980 Earl started a business in Ireland extracting precious metals from used x-ray film and computer scraps. He lived in an apartment in Dublin during the work week to run the business while Carolyn lived in London and later rented a home in Sligo and lived with the owner named Bridy Regan, who served as her caregiver for the next several years.
In 1981 Fiona was twenty-five, a flight attendant with British Airways on inter-European *710 flights, and living in Scotland with a boyfriend. Earl, then forty-five, met Fiona when he was a passenger on a flight between London and Dublin. He handed her his business card after writing a note on the back asking her to call him sometime. Fiona waited about a month and called. They met in London a few weeks later and shared a romantic evening. Over the next few months Earl romanced Fiona in style, meeting her at the airport in a stretch limousine, taking her to expensive restaurants and other nice places. He bought her expensive gifts, including a ring which she testified he told her was an engagement ring. Earl traveled to Scotland to meet Fiona's family, and later they flew to California to meet his parents and son. Needless to say, Earl did not mention he was married, and it did not occur to Fiona that he might be.
In late 1981, Earl's metallurgy business went sour, and he sold it for a small profit. He decided to move to the Bahamas where he kept his boat and opened an investment business. Fiona testified she did not want a long-distance relationship and told Earl she would break off the relationship unless they got married. Fiona said that when Earl stated he wanted to make his new business profitable before they married, she relented and agreed to continue the relationship.
Earl, Carolyn and Bridy moved to Paradise Island, Carolyn rented a villa, and Earl divided his time between the villa and the boat he harbored on the island. Because of her job with British Airways, Fiona was able to fly to the Bahamas at minimum cost. She visited Earl about twenty times over the next two years, always staying with him on his boat. She knew nothing of Carolyn.
When Fiona told Earl she was tired of traveling back and forth from Europe, Earl suggested she quit her job and live in the Bahamas. She said he was able to pay all of her expenses because he had an independent income. Fiona agreed although she said she was happy working at British Airways and knew that by quitting she gave up her salary, travel benefits, a pension plan, and the opportunity to attend a management training program. Earl, however, testified that Fiona expressed frustration that she had not received a promotion and was interested in leaving British Airways.
Fiona took advantage of a £12,000 buyout that British Airways was offering for voluntary resignations in 1982 and moved to the Bahamas to join Earl. Although she brought some money with her, her living expenses were paid from a joint bank account opened and funded by Earl. When she arrived, Earl rented a condominium for her on the other side of the island from the villa where he sometimes lived with Carolyn. Before Fiona left the U.K., Earl explained she would have to live separate from him at first because he lived with an elderly, sick aunt who depended on him and did not want anyone else living with her.
During the year she spent in the Bahamas, Fiona did not work, and Earl paid all of her expenses. They would "go fishing, tour around the island, go to the beach, visit with friends, and enjoy life." When Earl's tax shelter business began to fail, he started a mortgage business with Fiona which Earl said would do better in Florida. So they moved to Ft. Lauderdale where Earl, Carolyn and Bridy rented a villa, and Fiona moved into a nearby apartment. Fiona said she had still not met Earl's "elderly aunt."
Earl and Fiona both worked in the business which began as a financial consulting company and later became a mortgage services company. Earl continued to pay *711 Fiona's rent and living expenses. He also purchased a new convertible for her. They traveled together on business to France and London. Fiona was regularly introduced to Earl's friends and associates as his girlfriend. It was during their first year in Florida, Fiona testified, that she finally met Carolyn. At a Christmas lunch Earl introduced them to each other simply as Fiona and Carolyn. Of course Fiona believed Carolyn to be the elderly and possessive aunt.
Living in Florida, Earl and Fiona would usually go to work, spend the day in the office, come home to walk the dogs, then go out to dinner or socialize with friends. Fiona took classes to obtain a real estate license and learn about the mortgage business. Matters were complicated by the fact that Fiona never got a green card so that all the income from the business was attributed to Earl. They lived high and spent all they earned. When things went well with the business, they lived on the proceeds. Oscar Wilde quipped, "Nothing succeeds like excess," and this was very true for Earl and Carolyn at this time.
But Fiona's mother kept asking when she and Earl were to be married, and at Fiona's insistence plans were made for a wedding in Scotland. Caterers were booked, flowers were arranged, invitations were printed, and Fiona and Earl made application for a marriage license. It was then that Earl's carefully constructed plan began to unravel. He cancelled the first wedding date, claiming a business commitment made it impossible. After the wedding was rescheduled, the licensing office in Scotland called Earl. After he hung up the phone, he told Fiona that there was a delay in getting the marriage license approved. He also said that the wedding had to be put off again because he had to be abroad on another business trip. Fiona now suspected something was wrong.
While Earl was out of the country, Fiona went to California, reviewed Earl's marriage records, and discovered that he was married to Carolyn. She immediately called him in Bangkok. At first he lied, but in a subsequent phone call he admitted he was married to the woman he called his aunt. In a series of overseas phone calls Earl assured Fiona that his relationship with Carolyn was not a true marriage, and he begged her not to leave him. He told her he contemplated talking to Carolyn about a divorce but could not bring himself to do so after she broke her hip. Fiona met him in London, and they spent a week or two discussing their relationship. When they returned to Florida, Earl thought that things were smoothed over. But Fiona started making plans with her mother to move on. She asked Earl for $20,000 as traveling expenses back to the United Kingdom and six months living expenses. Earl agreed to help if it was her final decision to leave, but he reiterated his feelings for her and his plan to move on to "the next step" as soon as the business was profitable and he could set up Carolyn independently.
Outside events intervened in late 1985 or early 1986 when Earl received word that his brother in Las Vegas was terminally ill and wanted Earl to help him run his business of minting coins for use by casinos. Earl started traveling to Las Vegas to assist his brother while Fiona continued to run their business in Florida. After Earl's brother died, Earl took over his business. He convinced Fiona to abandon her plan to leave and move with him and Carolyn to Las Vegas. Fiona agreed on condition that she and Earl live together under the same roof and that Earl explain their relationship to Carolyn. So after three years in Florida, Earl, Carolyn and Fiona moved to Las Vegas where they lived in a 7,000 square foot ranch home costing between *712 $6,000 to $7,000 a month. But it soon became clear that Carolyn was not happy with the new living arrangement.
When Earl and Fiona were in Atlantic City on a business trip, Carolyn left the Las Vegas house, emptied the joint bank account, moved in with one of her exhusbands in Chicago, and filed for divorce from Earl. Carolyn's move was disastrous for Earl and Fiona. A lawsuit was initiated by Earl's sister-in-law and the other partners in the minting business. Since the house was in the company name, Earl and Fiona were evicted and moved to a hotel and then to a small apartment. Saddled with debt and legal fees they lived off credit cards.
Earl went to Carolyn to borrow money, and as a result, they reconciled. As luck would have it, things did not work out for Carolyn with her ex-husband. She dropped her divorce petition against Earl and moved back to Las Vegas to a townhouse in the Las Vegas Country Club. Earl and Fiona then rented an adjacent townhouse. Fiona saw Carolyn on a daily basis and became friendly with her. Within a short time, Earl, Carolyn and Fiona all moved into a larger townhouse. Earl and Fiona slept in the master bedroom while Carolyn slept in a smaller bedroom. A caregiver for Carolyn came in from morning to evening on weekdays, and Fiona would help Carolyn into bed at night and take care of her on weekends.
After the lawsuit with his sister-in-law was resolved, Earl began a second business minting coins, and Fiona assisted him by managing the office. Initially, the company did well. Earl and Fiona took no salary, living off the proceeds and assistance from Carolyn. They resumed their upscale lifestyle of dining out and shopping at expensive stores. The money came from a joint bank account with Carolyn. Fiona joined the Junior League and made charitable contributions. Earl and Fiona again discussed marriage, but the discussions were always predicated upon first building a successful business. Times were good until the Securities and Exchange Commission showed up with subpoenas. Earl had taken the minting company public, but fraud by the attorney who handled the public offering and several stockbrokers forced the company to close down operations. Once again, Earl and Fiona had no business income and were more dependent upon Carolyn and her trust fund.
Undaunted by his unbroken string of unsuccessful businesses, Earl began consulting with the New York Institute of Technology and he explored the possibility of moving to Switzerland with both Fiona and Carolyn. But a new impediment arose when the Internal Revenue Service alerted Earl that Carolyn had incurred an IRS tax obligation of about $1 million. The trust was paying off the debt at the rate of $14,000 per month when Earl was advised that Carolyn could file for bankruptcy and somehow erase the debt if she established residency in Illinois. Accordingly, Earl, Carolyn and Fiona packed up and left Las Vegas to go to Chicago. Earl moved on to New York to work for the Institute of Technology. He took the train to Chicago on weekends.
At first Fiona, Carolyn and Carolyn's caregiver were living together in Chicago, but the caregiver quit leaving Fiona alone to care for Carolyn. Fiona prepared Carolyn's meals, got her up, put her to bed, assisted her with bathing, showering, dressing, and took her to lunch. During this time, Fiona and Carolyn grew closer. Carolyn told Fiona that she was dependent on Earl and worried that Earl might leave. She wanted to be sure that Earl was committed to her and her needs. She said she did not have many years left and wanted *713 Earl to remain a major part of her life. She believed she needed the marriage to protect herself from legal actions by her children. She also liked having someone she could call her "husband."
Sometime in 1992, the bankruptcy was completed and Earl, Fiona and Carolyn moved again. First to a friend's house in Connecticut and then to a two-bedroom condominium in a complex in North Bergen. Earl and Fiona once again shared the master bedroom and Carolyn slept in a smaller bedroom. A daytime caregiver was hired to help Carolyn during the week while Fiona cared for her at night and on weekends. Since the IRS obligation was no longer draining Carolyn's trust income, their luxurious lifestyle resumed. The three shared a joint bank account into which Carolyn's trust income was deposited and on which Fiona's name was listed as "Fiona Johnson." Fiona and Carolyn took a week-long trip together to a resort in Palm Springs to visit some of Carolyn's old friends. Fiona charged around $3,000 per month on credit cards and Earl and Fiona together spent around $4,000 per month dining out. Fiona drove a BMW and a Jaguar. Earl's boat incurred expenses of about $40,000 a year. Fiona testified it was about this time that Earl started introducing Fiona as his wife. He talked to her of retiring together if they could put enough money together to live on the boat in the Caribbean or move to Europe.
While they lived in New Jersey, Earl took money from Carolyn's trust income to start two businesses. The first, New York Film and Animation, was managed by Earl, and Fiona worked in the second, Student Travel Bureau (STB). Earl did not work at STB on a regular basis, and Fiona was not involved in Earl's other business. STB was unprofitable for about three years, but by 1997 it began to earn money. Earl was using the profits to either pay expenses for New York Film and Animation or for personal expenses. Fiona never drew a salary from STB, but she continued to have all her expenses paid out of the joint bank account.
In 1996 the parties leased a larger, three-bedroom condominium with an option to buy in the same complex in North Bergen. Fiona testified that when it came time to exercise the purchase option, they did not have funds on hand for the down payment. Fiona said she borrowed £5,000 from her mother to use as part of the down payment. The total purchase price was $317,779.50, with $41,779.50 put up in cash and the remaining $276,000 financed by a mortgage given to Earl and Carolyn Johnson. Although Fiona's name initially appeared on the mortgage application as "Fiona Johnson," her name was not put on the mortgage or deed after the lender's search revealed that Carolyn was Earl's wife. Fiona testified that she was told by Earl that her name would be added to the deed after the closing, but it never happened.
After the purchase, things took a downturn. New York Film and Animation, like Earl's other businesses, failed. He sold what was left of the company but retained significant debt that he and Carolyn had personally guaranteed. Bank of America was pressing Earl for $65,000 used for expenses related to his boat. Carolyn also became difficult to deal with after money became tight. Ironically, Fiona was managing STB to a profit. She said that on one occasion she made a large sale which resulted in a commission of almost $20,000. Fiona said she planned to use it to pay off credit card debt and put aside something for herself. However, Earl quickly used the money for other expenses. Fiona testified that at this point she realized that the situation was never going to be resolved *714 to her satisfaction and that Earl would always be dependent on Carolyn's trust income. She decided that her relationship with Earl was never going to work and that she "didn't want this to be... [her] life anymore."
Fiona told Earl she planned to leave, asked him for start-up funds to return to the U.K., and to carry her for some time. She said Earl agreed to sell the North Bergen condominium in order to raise funds and to give her a portion of the proceeds. However, the condominium was never listed for sale, and the rapport between Earl and Fiona quickly deteriorated. They ceased being intimate and began sleeping separately. They argued a lot and avoided each other. Fiona began staying with a female friend in Connecticut on weekends. She said Earl became jealous and started keeping tabs on her.
Finally, in June 2000 Fiona moved out of the North Bergen condominium and began staying in a vacant apartment in the same building that STB had its offices. When she asked for money to leave the country and re-establish herself, Earl refused and told her he would not help because she left him. Fiona testified that Earl ran up $25,000 on an American Express account which listed Fiona as the primary holder and he refused to pay off the amount for three months despite their prior agreement that he would take care of all of her credit card bills. Earl also failed to pay off her Bloomingdale's card account. When Fiona went to the condominium to collect her things, Earl tried to physically remove her and later changed the locks.
Fiona next moved to New York City while continuing the business of STB. She began working with a series of travel agents, and made approximately $60,000 per year until she returned to London two years later.
After Fiona left in 2000, Earl and Carolyn continued living in the North Bergen condominium. When lawsuits were threatened because of Earl's indebtedness and the failure of New York Film and Animation, Earl obtained a divorce and conveyed the condominium to Carolyn in her sole name. However, in 2001 Carolyn conveyed the property back to both names to take out a second mortgage and refinance in a higher amount to pay off some indebtedness and obtain a lower interest rate. Within a few months the property was deeded back to Carolyn alone. Just prior to Fiona's filing the lawsuit Earl and Carolyn remarried.
Carolyn's health is failing; she now employs two caregivers. Earl started another business involving international fraud investigations and borrowed $10,000 from Carolyn to capitalize it. He also works as a special police officer. He claims that he has no significant personal assets, and the condominium is in Carolyn's name alone. Prior to trial the condominium was appraised at $710,000 with an existing first mortgage of $385,600.
Fiona testified that since she moved back to London, she has not been able to live the same lifestyle to which she grew accustomed while living with Earl and Carolyn. She is only able to spend about one third of the amount she spent during that period of her life. She does not dine out much, and thinks carefully about traveling. She has not been able to afford to buy a house or condominium. Instead she rents a two-bedroom apartment in London with her boyfriend. Since leaving Earl, she started a pension plan, but she will not be able to put enough money into it to generate any significant return. She has remained in the travel business and makes about £30,000 (roughly $60,000 per year).
Four years after she left Earl, Fiona contacted him and asked for money in *715 recompense for the years that she lived with him as well as part of the value of the North Bergen condominium. Earl did not respond. Fiona filed her complaint against Earl and Carolyn on May 25, 2004, alleging, inter alia, breach of a palimony agreement by Earl, unjust enrichment, fraud, and conversion of monies she contributed to the down payment of the North Bergen condominium.
After an eight-day trial, the trial judge issued a decision that there was an enforceable agreement that Earl support Fiona for life. The judge assessed damages by finding that Fiona would need $4,000 a month to supplement her income as a travel agent to equal the lifestyle she enjoyed while living with Earl and multiplied the amount over sixteen years until Fiona reaches the retirement age of sixty-five. The judge then took that amount totaling $768,000 and divided it in half in recognition of the fact that Earl's income was largely derived from Carolyn, fixing the amount of the judgment against Earl at $384,000. The judge further ordered that title to the North Bergen condominium be returned to Earl and Carolyn with right of survivorship.[1] The judgment was to be secured by a zero interest mortgage to Fiona against the North Bergen condominium and that Earl make payment to Fiona of $1,000 per month.
The judge further held that Fiona was entitled to fifteen percent of the equity in the North Bergen condominium based on the thirteen percent she contributed for the down payment and an additional two percent to reflect her contribution to the parties' finances while she was working at STB. Finding that Earl and Carolyn had approximately $324,000 in equity at the time the complaint was filed in 2004, the judge awarded Fiona $48,668 secured with a mortgage against the condominium.[2] The judge then denied Fiona's motion for counsel fees on grounds that counsel fees may not be awarded in an action for palimony.
We hold that under the facts of this case that Fiona was not entitled to palimony. A valid cause of action for palimony requires an agreement to pay future support made during a marital-type relationship between unmarried persons. Devaney v. L'Esperance, 195 N.J. 247, 257, 949 A.2d 743 (2008); In re Estate of Roccamonte, 174 N.J. 381, 391-92, 808 A.2d 838 (2002); Kozlowski v. Kozlowski, 80 N.J. 378, 384-86, 403 A.2d 902 (1979); Marvin v. Marvin, 18 Cal.3d 660, 134 Cal. Rptr. 815, 557 P.2d 106, 122 (1976). There is no bright-line definition of a marital-type relationship. It is not defined by a lengthy affair or a live-in relationship. On the other hand, the absence of cohabitation does not disqualify a person from palimony if the entirety of the relationship leads to the finding that the parties were in a marital-type relationship. Devaney, supra, 195 N.J. at 258-59, 949 A.2d 743. Our Supreme Court has described the relationship in general terms as one
in which people committed to each other, foregoing other liaisons and opportunities, doing for each other whatever each is capable of doing, providing companionship, and fulfilling each other's needs, financial, emotional, physical, and social, as best as they are able. And each couple defines its way of life and each *716 partner's expected contribution to it in its own way....
[Roccamonte, supra, 174 N.J. at 392-93, 808 A.2d 838.]
In finding that Earl and Fiona were involved in a marital-type relationship, the trial judge stated:
The cohabitation was in the marriage-type relationship. There was some discussion about whether or not Ms. Bayne was ever introduced as Mr. Johnson's wife. And Mr. Johnson stated, I believe it was in depositions, that ["]she didn't want to be known as my wife. She wanted to be known as Fiona Bayne, she wanted to be her own individual person.["] All right. There are plenty of wives these days, probably more than not, that retain their  their maiden name, their birth name. And plenty of wives these days who are known in their individual sense.
That doesn't erase the fact that it was marriage-type relationship and if it was even needed, it can be said that they had interchangeable names, as I said before. She was known as Fiona Johnson, she was known as Fiona Johnson on her bank records with him. He was known as Earl Bayne on the PSE & G bill. Nobody thought anything of it. It was a marriage-type relationship. They cared for each other. They cared for each other's needs. They took care of each other's family. It was a marriage-type relationship.
Later the judge added:
These parties [were] bound together for a lifetime. There's no doubt in my mind. Mr. Johnson even testified to it, that this was going to be a long-term, permanent relationship. He mulled over the thought of marriage, he mulled over the thought of being able to go to Carolyn and say, ... ["]I'm going to divorce you, I'm going to marry Fiona.["] Carolyn Johnson, in her testimony, even talked about the fact that Earl ["]asked me how did I feel about, what did I think about him marrying Fiona.["] She really didn't answer it, but it was discussed. He thought about it. It was something he wanted to have happen, but he couldn't figure out how to do it.
He and Fiona Bayne clung together as a couple for the better part of 20 years. Based on mutual affection, based on need, based on love.
Family Part judges are deemed to have developed "special expertise" in dealing with family and family-type matters. Roccamonte, supra, 174 N.J. at 399, 808 A.2d 838; Cesare v. Cesare, 154 N.J. 394, 412-13, 713 A.2d 390 (1998). Their findings are binding on us if supported by adequate, substantial and credible evidence in the record. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974); Crowe v. DeGioia (Crowe II), 203 N.J.Super. 22, 33, 495 A.2d 889 (App.Div.1985). Our extensive review of the record convinces us that there was a marital-type relationship between Fiona and Earl dating back at least to the time she abandoned her intention to return to the U.K. and moved with him to Las Vegas.
We look next to the trial judge's findings that during their marital-type relationship Earl promised Fiona that he would support her for life and that his promise was made in exchange for valid consideration. Levine v. Konvitz, 383 N.J.Super. 1, 3, 890 A.2d 354 (App.Div.), certif. denied, 186 N.J. 607, 897 A.2d 1061 (2006). The trial judge found while there was no express promise to support Fiona for her life, the facts establish that Earl made an implied promise to do so.
There is no traditional support, a lifetime of support any longer. There is no, *717 stay home and I will take care of everything. Those words aren't even said among married people. There's discussions (sic) specifically in Kozlowski that says these words don't need to be said. Things don't have to come out of people's mouths. In these kind[s] of relationships, there is not normally a writing, a discussion, but we have to look at the totality of the circumstances, we have to look at the acts and the conducts [sic] of the persons.
....
[Earl] and Fiona Bayne clung together as a couple for the better part of 20 years. Based on mutual affection, based on need, based on love. There was a thought between them that there would be a lifetime of support, each to the other. The words were said, not in the traditional Kozlowski, I will take care of you for the rest of your life, but the words were said.
I want to marry you, as soon as the businesses take off and I can figure out how to take care of Carolyn. We will take this to the next step. And the next step was marriage. They were clinging for that. So there was that implied promise there.
It is long settled that a promise to support in a palimony action may be expressed or implied. Kozlowski, supra, 80 N.J. at 384, 403 A.2d 902.
[T]he existence of the contract and its terms are ordinarily determinable not merely by what is said but primarily by the parties' "acts and conduct in the light of ... [their] subject matter and the surrounding circumstances." We thus concluded that a general promise of support for life, broadly expressed, made by one party to the other with some form of consideration given by the other will suffice to form a contract.
[Roccamonte, supra, 174 N.J. at 389-90, 808 A.2d 838, quoting from Kozlowski, supra, 80 N.J. at 384, 403 A.2d 902.]
However, we are not satisfied that the findings of the trial judge are sufficient to conclude there was an implied promise by Earl to support Fiona for her lifetime. When she moved to the Bahamas to join Earl, it was in anticipation of marriage when the new business was successful. When she followed him to Las Vegas after discovering he was married to Carolyn, it was not based on a promise of support but on the condition that they live together under the same roof. While there was at least an implied or perhaps an express promise of marriage, a palimony claim may not be based on such a promise under the Heartbalm Act, N.J.S.A. 2A:23-1. Kozlowski, supra, 80 N.J. at 387, 403 A.2d 902.
Moreover, the trial court's statement that, "There was a thought between them that there would be a lifetime of support, each to the other," does not constitute the requisite promise by Earl to support Fiona during her lifetime but simply recognizes the desire of each to remain together in their relationship. What promises Earl did make were in the context of marriage desired by Fiona  and perhaps also by Earl  and always conditioned upon an elusive business success or the question of what to do about Carolyn. As found by the trial judge, there was never an express promise of lifetime support, and the record does not substantiate the finding of an implied promise.
Moreover, there was no detrimental reliance by Fiona upon any alleged promise of support. See In re Estate of Sasson, 387 N.J.Super. 459, 468, 904 A.2d 769 (App. Div.2006). Fiona well knew through much of the duration of her relationship with Earl, and especially in the latter years, Earl was a failed entrepreneur. Indeed, *718 she testified that she left Earl in part because she realized that he would always be dependent on Carolyn's money. She knew that Earl alone could not support her in her adopted lifestyle, and that even if he made a promise of lifetime support, he was incapable of performing it.
Furthermore, while a palimony claimant need not show complete dependency on the other party or destitution, see Connell v. Diehl, 397 N.J.Super. 477, 494, 938 A.2d 143 (App.Div.2008), there must be a showing of economic inequality and an inability by the party seeking palimony to live independently at a reasonable level of support. As stated by the Supreme Court,
The issue is, more pertinently, one of economic inequality, and the relevant question is whether the promisee is self-sufficient enough to provide for herself with a reasonable degree of economic comfort appropriate in the circumstances.
[Roccamonte, supra, 174 N.J. at 393, 808 A.2d 838.]
The trial record indicates that at the time of her departure and afterwards, Fiona was more economically self-sufficient that Earl. Certainly there is no showing that Earl has the ability to earn sufficient income to pay lifetime support to Fiona, much less satisfy the palimony award in the judgment. The trial judge made no findings as to Earl's income capacity or ability to pay support except the following:
Last sticky point that Kozlowski puts out for us, is the ability of each party to earn a living after the relationship dissolved. Hmm, yet another one that caused me to stroke my head. I have a hard time with Mr. Johnson's ability to earn a living. For all his entrepreneurship, every business he tries goes belly up. For all his entrepreneurship, he's run every business into the ground.... He's not a very good businessman, but he hasn't had to be, because he's had Carolyn Johnson's trust fund. His ability to earn a living is directly linked to Carolyn Johnson's ability to stay alive. It's pretty sad, but that's the way it is....
He also has a right, at 69, soon to be 70, to retire, if he likes. And that retirement and its benefit should only tangentially affect Ms. Bayne. Since he, obviously, has been working for many more years then his relationship with Ms. Bayne ensued, and he will be retiring, if he wanted to, on Ms. Johnson's trust fund, while she was still alive. Since he also, it would appear, didn't entirely pay into social security, based on his income, since his income was so minimal throughout the years. Mr. Johnson's ability to earn income is one of the only issues that I'm having a hard time resolving.
In contrast to the plaintiffs in Kozlowski, Roccamonte, and Crowe, nothing in the record indicates that with her income of approximately $60,000 a year, Fiona is unable "to provide for herself a reasonable degree of economic comfort appropriate in the circumstances." Ibid.
Palimony is the enforcement of a broken promise made for future support. Kozlowski, supra, 80 N.J. at 388, 403 A.2d 902. It is not recompense for years spent in a failed relationship. Fiona may speculate as to what could have been had she not met Earl or left him earlier, but palimony is not an economic substitute for opportunities that may have been lost or expectations that were unfulfilled.
Finally, it cannot be ignored that it was Fiona who left Earl. She did so not as a result of a breach of promise of support or Earl abandoned her in favor of another like the promisees in Kozlowski and Crowe. Rather it was because she finally *719 recognized that her relationship with Earl was not going to work out to her satisfaction and that he would always be economically dependent on Carolyn. As Fiona put it, "I didn't want this to be my life anymore." Certainly her decision was understandable, but in our view it did not result in a valid palimony claim due to the absence of any promise of lifetime support.[3]
We do concur, however, in the decision of the trial judge to award Fiona a portion of the 2004 equity in the North Bergen condominium based on the judge's factual finding that she contributed £5,000 toward the down payment and also increased the amount of equity through contributions from her STB earnings. While Earl argues to the contrary, we find that there was substantial, credible evidence in the record supporting Fiona's contention that she received the amount as a gift from her mother and gave it to Earl to apply toward the down payment. See Rova Farms, supra, 65 N.J. at 483-84, 323 A.2d 495.
Earl's further argument is that any interest awarded to Fiona based on her trial testimony violated the statute of frauds, N.J.S.A. 25:1-13. This contention was addressed and rejected in both Kozlowski supra, 80 N.J. at 387, 403 A.2d 902, and Crowe, supra, 203 N.J.Super. at 33-34, 495 A.2d 889, based upon part or full performance. Moreover, the statute of frauds cannot be invoked to work an injustice. In re Estate of Yates, 368 N.J.Super. 226, 236, 845 A.2d 714 (App.Div.2004); Graziano v. Grant, 326 N.J.Super. 328, 341, 741 A.2d 156 (App.Div.1999). It would be a clear injustice to deprive Fiona of her contribution to the down payment and proportionate increase in equity of the condominium and also constitute an unjust enrichment to Earl and Carolyn. We conclude therefore that the trial judge did not err in awarding Fiona an amount representing her contribution enhanced by an increase in the equity of the property.
Fiona's cross-appeal from the denial of an award of counsel fees has no merit since we have held that Fiona was not the successful party on her palimony claim. Finally, we hold that it was not an abuse of discretion to award Fiona the sum of $3,700, pursuant to Rule 1:2-4(a), as reimbursement for counsel fees and travel expenses incurred when Earl and Carolyn did not appear for a trial date, necessitating an adjournment.
Affirmed in part. Reversed in part.
NOTES
[1] Earl does not appeal this part of the judgment.
[2] The judgment established the priority of the mortgages on the property with institutional mortgages first, then the mortgage given by Earl and Carolyn to their trial counsel, and followed by the mortgages given to Fiona to secure the judgment. Fiona does not appeal from this part of the final judgment.
[3] In light of this determination it is unnecessary for us to address Earl's contention that the trial judge improperly fashioned a palimony award.